**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**CASE NO.: 8:20-cv-00394**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **KINETIC INVESTMENT GROUP, LLC and** | ) |
| **MICHAEL SCOTT WILLIAMS,** | ) |
| | ) |
| **Defendants, and** | ) |
| | ) |
| **KINETIC FUNDS I, LLC,** | ) |
| **KCL SERVICES, LLC d/b/a LENDACY,** | ) |
| **SCIPIO, LLC,** | ) |
| **LF42, LLC,** | ) |
| **EL MORRO FINANCIAL GROUP, LLC , and** | ) |
| **KIH, INC. f/k/a KINETIC INTERNATIONAL, LLC,** | ) |
| | ) |
| **Relief Defendants.** | ) |
| ———————————————————— | ) |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**EMERGENCY MOTION AND MEMORANDUM OF LAW**
**FOR ASSET FREEZE AND OTHER RELIEF**

I.    **INTRODUCTION**

The Commission seeks emergency relief to protect investors from an ongoing securities fraud perpetrated by Kinetic Investment Group, LLC ("Kinetic Group") and Michael Scott Williams ("Williams") (collectively, "Defendants").  Since at least 2013, Defendants have raised at least $39 million from at least 30 investors located in Florida and Puerto Rico in an unregistered securities offering.  Defendants solicited investors to invest in Kinetic Funds I, LLC ("Kinetic Funds"), a purported hedge fund with a sub-fund structure that they managed.

They steered investors toward the largest sub-fund, Kinetic Funds Yield ("KFYield"), on the premise that the fund was conservative and safe.  Specifically, Defendants told investors that their entire capital would be invested in income-producing U.S. listed financial products and that their principal would be secure because the KFYield portfolio would be hedged with listed options.  They also touted the liquidity of KFYield assets and represented to investors that their "money is always available."

In reality, Defendants diverted a substantial portion of KFYield investor capital to KCL Services, LLC d/b/a Lendacy ("Lendacy"), a private, start-up company owned by Williams. Lendacy was neither listed on a U.S. exchange nor capable of being hedged with listed options. Williams then directed Lendacy to make purported loans using KFYield assets to himself, entities controlled by him, and others.  Since at least 2015, Williams has misappropriated at least $6.3 million[1] of Kinetic Funds' assets to fund other business ventures and to pay for personal expenses.  Relief Defendants Kinetic Funds, Lendacy, Scipio, LLC ("Scipio"), LF42, LLC ("LF42"), El Morro Financial Group, LLC ("El Morro"), and KIH, Inc. f/k/a Kinetic International, LLC ("KIH") (collectively, "Relief Defendants") all received Kinetic Funds assets and proceeds of Defendants' securities violations without any legitimate entitlement to the funds.  Through their fraudulent conduct, Defendants have each violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), and Sections 206(1), 206(2), 206(4) and Rule 206(4)-8 of the Investment Advisers Act of 1940 ("Advisers Act").

---

[1] Ex. 1, Declaration of Crystal C. Ivory at ¶14.

To protect investors and prevent further dissipation of assets, the Commission seeks asset freezes and other emergency relief against Defendants and Relief Defendants. Williams is in sole control of Kinetic Group and Relief Defendants, as well as their assets and bank accounts. As of October 2019, Kinetic Funds has approximately $28.7 million in assets[2] and approximately $6.4 million of pending redemption requests.[3] Due to the shortfall in Kinetic Funds' assets caused by Defendants' misappropriation, any payment of redemptions will result in a preference to redeeming investors at the expense of the remaining investors. Unless the assets of Defendants and Relief Defendants are frozen, Williams will retain control over their assets and responsibility for ensuring the return of investors' funds, a role he is utterly unfit to fulfill.

## II.   FACTS

### A.   Defendants

**Kinetic Group**, formerly known as Kinetic Management Group, LLC, is a private Florida limited liability company formed by Williams in 2013 with its principal place of business in Sarasota, Florida.[4] Kinetic Group manages Kinetic Funds, a private pooled investment fund,[5] and charges Kinetic Funds a 1% management fee.[6]

---

[2] Ex. 1, Ivory at ¶8.
[3] Ex. 2, Redemption requests at KFI 6479-6498.
[4] Ex. 3, Kinetic Group Florida corporate filing.
[5] *Id*.; Ex. 4, Form D filed by Kinetic Funds; Ex. 5, E-mail from Williams at SEC-Consultiva-E 0059619; Ex. 6, Kelly Locke Tr. at 26:24-27:8.
[6] Ex. 7, E-mail from Williams enclosing Kinetic Funds' Subscription Agreement, Operating Agreement, Exhibit B-1 and Exhibit C-2 thereto, and Offering Questionnaire, at SEC-Consultiva-E 0061263 and 0061268; Ex. 6, Locke at 186:17-20.

**Williams**, age 51, is a resident of San Juan, Puerto Rico, and resided in Sarasota, Florida during the relevant time period.[7]  Williams is the managing member of Kinetic Group,[8] Kinetic Funds[9], Lendacy[10] and LF42[11], the president of Scipio[12] and El Morro,[13] and a shareholder of KIH.[14]  Williams is also the managing member of Kinetic Partners, LLC, which in turn is a managing member of Kinetic Funds.[15]  At all relevant times, Williams had an ownership interest in, controlled, and exercised ultimate authority over Kinetic Group and Relief Defendants.[16]

## B.    Relief Defendants

**Kinetic Funds** is a Delaware limited liability company with its principal place of business in Sarasota, Florida.[17]  Kinetic Funds was formed by Williams in 2012 and operates as a private pooled investment fund managed by Defendants.[18]  Kinetic Funds filed a Form D with the Commission in October 2016 claiming an exemption under Rule 506(c) of the Securities Act for its pooled investment fund interests with a first sale date of October 2012.[19]

---

[7] Ex. 8, Williams CRD/IARD; Ex. 9, Recorded deed for Puerto Rico residence; Ex. 6, Locke at 20:12-15, 64:23-65:2, 110:1-8, 109:22-25; Ex. 10, Keli Pufahl Tr. at 58:19-22.

[8] Ex. 3; Ex. 11, BMO Harris records at SEC-BMO-P 0000481-0000484.

[9] Ex. 7, SEC-Consultiva-E at 0061310 and 0061271.

[10] Ex. 12, Lendacy Florida corporate filing; Ex. 13, BMO Harris record at SEC-BMO-P 0001407-0001409, 0000004-0000010.

[11] Ex. 14, BMO Harris record at SEC-BMO-P 0000803-0000809.

[12] Ex. 15, Certificate of Formation as to Scipio.

[13] Ex. 16, Certificate of Formation as to El Morro.

[14] Ex. 17, Unanimous Written Consent of the Board of Directors of KIH.

[15] Ex. 18, BMO Harris records at SEC-BMO-P0001198-0001204; Ex. 7 SEC-Consultiva-E at 0061304.

[16] *See supra* n. 8-14.

[17] Ex. 19, Kinetic Funds Delaware corporate filing; Ex. 4.

[18] *Id*.

[19] Ex. 4.

**Lendacy** is a Florida limited liability company formed by Williams in 2013 with its principal place of business in Sarasota, Florida.[20]  Lendacy was formed by Williams in 2013 and is purportedly in the business of providing lines of credit to accredited investors.[21] Lendacy received at least $11 million of investor assets and approximately $9.1 million has not been returned.[22]  Defendants then used the investor funds diverted to Lendacy to fund purported loans to Williams, his business entities, and others, and at least $6.8 million remains outstanding from Williams and his entities.[23]

**Scipio** is a Puerto Rico limited liability company formed by Williams in 2016 with its principal place of business in San Juan, Puerto Rico.[24]  Scipio used at least $2,755,000 of investor assets routed through Lendacy to purchase a historic bank building in San Juan, Puerto Rico.[25]

**El Morro** is a Puerto Rico limited liability company formed by Williams in 2016 with its principal place of business in San Juan, Puerto Rico.[26] El Morro received at least $565,000

---

[20] Ex. 12.

[21] *Id*.; Ex. 20, E-mail enclosing Lendacy brochure, Bloombert reports and Lendacy credit application, at pp. 3-4.

[22] Ex. 1, Ivory at ¶11.

[23] Ex. 21, Credit Facility Agreement and Disclosure ("Agreement") between Lendacy and Williams for $1,517,000; Ex. 22, Agreement between Lendacy and Scipio for $2,755,000; Ex. 23, Agreement between Lendacy and LF42 for $550,000; Ex. 24, Agreement between Lendacy and LF42 for $2,000,000; Ex. 25, SEC-BishopJ-E 0000002, Summary of misappropriated funds.

[24] Ex. 15; Ex. 6, Locke at 83:11-25.

[25] Ex. 6, Locke at 85:8-94:19; Ex. 22; Ex. 26, Recorded deed for bank building; Ex. 27 and 28, BMO Harris records showing fund transfers for purchase; Ex. 29, check payments for fees associated with purchase; Ex. 25.

[26] Ex. 16; Composite Ex. 30, Certificate of Existence, Certificate of Organization.

of investor assets, routed through Lendacy, to fund general operating expenses for Williams' various entities and to partially fund a multi-day launch event for KIH.[27]

**KIH** is a Puerto Rico corporation with its principal place of business in San Juan, Puerto Rico.[28]  Williams formed KIH in 2018 as a purported Puerto Rico licensed international financial entity.[29]  KIH used at least $1,380,000 of investor assets to fund its start-up costs.[30]

**LF42** is a Delaware limited liability company formed by Williams in 2012 with its principal place of business in Sarasota, Florida.[31]  LF42 executed a credit agreement with Lendacy reflecting a loan for $2,550,000, of which a substantial portion was used by El Morro and KIH and at least $100,000 was retained by LF42.[32]

## III.   <u>VENUE</u>

This Court has personal jurisdiction over Defendants and Relief Defendants and venue is proper in the Middle District of Florida.  Kinetic Group maintains an office in Sarasota, Florida.[33]  Williams maintains sole control over Kinetic Group and resided in Sarasota, Florida during the relevant time period.[34]  As of June 2019, Defendants raised at least $39 million from investors, including at least five residing in this district.[35]

---

[27] Ex. 1, Ivory at ¶14; Ex. 10, Pufahl at 109:21-111:9, 112:14-113:13.
[28] Ex. 31, Certificate of Formation.
[29] *Id.*
[30] Ex. 1, Ivory at ¶14; Ex. 25; Ex. 32, Carla Mendez Tr. at 77:15-80:3; 94:7-96:12.
[31] Ex. 33, Certificate of Formation.
[32] Ex. 1, Ivory at ¶14; Ex. 23; Ex. 24; Ex. 32 Mendez Tr. at 104:12-20.
[33] Ex. 3.
[34] Ex. 6, Locke at 20:12-15, 64:23-65:2, 110:1-8, 109:22-25; Ex. 10, Pufahl Tr. at 58:19-22.
[35] Ex. 1, Ivory at ¶10; Ex. 34, Investor statements.

IV.   **FACTS**

A.   **The Kinetic Funds Offering**

Since 2012, Defendants have offered Kinetic Funds as an investment opportunity.[36] Kinetic Funds employs four investment strategies through sub-funds characterized as yield, gold, growth, and inflation.[37]   The yield strategy, known as KFYield, accounted for approximately 98% of Kinetic Funds' assets as of January 2019.[38]

Defendants solicited investors for Kinetic Funds in several ways.   Williams initially offered Kinetic Funds to his friends, partners and associates.[39]   Over time, Defendants developed marketing brochures, websites and used referrals to solicit additional investors.[40]

Defendants did not utilize a private placement or confidential memorandum to provide disclosures to potential investors.[41]   Rather, Defendants typically provided potential investors with (a) a copy of the Kinetic Funds Subscription Agreement ("Subscription Agreement"), (b) either Exhibit "B-1" or "C-1" to the Kinetic Funds Operating Agreement ("Operating Agreement"), which investors used to designate the strategy they wanted to invest in, (c) the Kinetic Funds Offering Questionnaire ("Offering Questionnaire"), and (d) Kinetic Funds marketing brochures.[42]   Defendants gave some investors a copy of the Operating Agreement.[43]

---

[36] Ex. 4.
[37] Ex. 1, Ivory at ¶10; Ex. 6, Locke at 33:22-34:8.
[38] *Id*.; Ex. 34.
[39] Ex. 5 at SEC-Consultiva-E-0059617.
[40] *Id*.; Ex. 35, E-mail from K. Locke at p. 1; Ex. 6, Locke at 174:15-175:6, 190:21-191:20, 193:21-196:8.
[41] Ex. 6, Locke at 106:21-112:11; Ex. 7 at SEC-Consultiva-E-0061256; Ex. 36, Letter from Kinetic Group to Florida Office of Financial Regulation.
[42] Ex. 6, Locke at 106:21-112:11; Ex. 7 at SEC-Consultiva-E-0061256.
[43] Ex. 6, Locke at 106:21-112:11.

In most cases, investors signed the Subscription Agreement and either Exhibit B-1 or C-1 to the Operating Agreement, and completed the Offering Questionnaire.[44]

The Subscription Agreement provides that an investor "irrevocably subscribes for a membership interest" in Kinetic Funds and that such membership interests are "'restricted securities' as that term is defined in Rule 144 under the [Securities Act of 1933]."[45]   Exhibits B-1 and C-1 to the Kinetic Funds Operating Agreement state that an investor agrees to invest in at least one of the Kinetic Funds investment strategies and that Williams has "full and complete discretion to make any and all trading decisions and affect any strategies as [he] shall determine . . . ."[46]   It provides that the KFYield focuses on "income generation" and that investors can make principal withdrawal requests under certain conditions.[47]   It further authorizes Kinetic Group to charge an annual 1% management fee.[48]

In 2015, Williams expanded the marketing materials in order to attract more investors.[49]   He arranged to have, among other things, a description of KFYield and its performance information, assets under management and holdings available on Bloomberg.[50] Williams took this step in order to make KFYield appear transparent and to give it a measure of credibility.[51]   From that point on, Defendants provided potential investors with Bloomberg

---

[44] *Id.*
[45] Ex. 7 at SEC-Consultiva-E-0061271.
[46] *Id.* at SEC-Consultiva-E-0061261 and 0061266.
[47] *Id.* at SEC-Consultiva-E-0061263 and 0061268.
[48] *Id.*
[49] *See, e.g.,* Ex. 20.
[50] Ex. 38, E-mail enclosing Bloomberg reports; Ex. 6, Locke at 139:24-142:13.
[51] Ex. 6, Locke at 113:6-16.

reports about the KFYield strategy.[52]  Williams was responsible for the content and accuracy of the information provided to Bloomberg.[53]

Williams also began in 2015 to market Kinetic Funds with his other entity, Lendacy. [54] Williams sometimes described Lendacy as a "real estate lending structure" designed to meet credit demands of accredited investors.[55]  Williams and his associate, who later became Lendacy's president, told prospective investors that if they invested in KFYield they were eligible to receive a Lendacy credit line of up to 70% of their investment in KFYield at low interest rates.[56]  They promoted case studies with various scenarios regarding the potential use of drawing on the credit line, such as refinancing a home.[57]

In 2016, Williams moved from Florida to Puerto Rico, opened a second office there, and began soliciting investors in Puerto Rico to invest in Kinetic Funds.[58]

Defendants ultimately raised approximately $39 million from at least 30 investors located mostly in Florida and Puerto Rico.[59]

## B.      The Misrepresentations and Omissions

Defendants made, both orally and in writing, material misrepresentations to investors and prospective investors regarding Kinetic Funds and the use of investor funds:

---

[52] *Id*. at 142:6-13.
[53] *Id*. at 114:11-13, 140:9-142:1, Ex. 39, Anadi Gaur Tr. at  266:12-267:10; Ex. 40, E-mail from K. Locke
[54] Ex. 5 at SEC-Consultiva-E-0059613; Ex. 6, Locke at 46:18-47:10, 223:3-224:18; Ex. 7; Ex. 41, E-mail from K. Locke enclosing Lendacy brochure; Ex. 42, E-mail marketing Lendacy and KFYield together.
[55] Ex. 43, Lendacy brochure.
[56] Ex. 6, Locke at 31:4-32:3, 40:14-19, 223:3-24; Ex. 43 at SEC-Consultiva-E-0064920.
[57] Ex. 43 at SEC-Consultiva-E-0064942.
[58] Ex. 6, Locke at 20:12-15, 109:22-25, 110:1-8.
[59] Ex. 1, Ivory at ¶10; Ex. 34.

a.      Defendants told investors that their money would be invested in income-producing U.S. listed financial products.[60]  Exhibits B-1 and C-1 to the Operating Agreement likewise state that Kinetic Funds "will trade derivatives, but may also be invested in individual stocks, components of the indices, cash, and other exchange listed products . . .".[61]

b.      Defendants advised investors that their principal would be secure because the KFYield portfolio would be hedged with listed options.[62]  Written marketing materials state that Kinetic Funds will "maintain 90% principle [sic] protection" and that "90% [of KFYield's] portfolio [is] hedged using listed options against market volatility risk."[63]

c.      With respect to the Lendacy credit line product, Defendants led prospective investors to believe Lendacy had a separate funding source that would finance the loan from Lendacy to the investor, and that their entire capital would be invested in KFYield.[64]  They gave investors marketing materials stating: "[y]ou keep 100% of your capital working, generating dividends and interest with the opportunity for continued appreciation." [65]

---

[60] Ex. 5 at SEC-Consultiva-E-0059606-0059607, 0059617; Ex. 35 at pp. 5-7, Ex. 43 at SEC-Consultiva-E-0064932-0064933;  Ex. 6, Locke at 155:10-156:13, 174:15-175:6;  Ex. 44, Declaration of Wilmer Gonzalez Vargas at ¶¶8-9.
[61] Ex. 7 at SEC-Consultiva-E-0061262, 0061267.
[62] Ex. 43 at SEC-Consultiva-E-0064932-0064933; Ex. 44, Vargas at ¶¶8-9.
[63] Ex. 35 at p. 6; Ex. 43 at SEC-Consultiva-E-0064920, 0064932.
[64] Ex. 6, Locke at 31:4-32:3-8, 126:24-127:17, 212:23-213:1-8; Ex. 45, Myrna Rivera Tr. at 51:8-52:10.
[65] Ex. 43 at SEC-Consultiva-E-0064938.

d.      Defendants touted the liquidity of KFYield assets.[66]  Written brochures claim: "Your money is always available . . . The fund's positions are hedged out to 90 days, so with a 30 day written notice prior to the quarter end, the fund can redeem 100% principal without penalties."[67]

Defendants knew the representations were false:

a.      Defendants did not invest all investor funds in U.S. listed financial products.[68] Since at least 2013, Defendants invested a substantial portion of investor capital in Lendacy, Williams' entity.[69]  Lendacy is not a U.S. listed financial product.[70]

b.      Defendants did not hedge at least 90% of KFYield's portfolio using listed options.[71]   KFYield assets diverted to Lendacy accounted for more than 23% of KFYield's proceeds between January 2015 and September 2019.[72]   And, Lendacy could not be hedged using listed options.[73]

c.      Defendants used KFYield assets, not a separate funding source, to fund Lendacy and its undisclosed loans. [74]  For example, if an investor invested $100,000 in KFYield and simultaneously borrowed $70,000 from Lendacy, Kinetic Group would transfer $70,000 from KFYield to Lendacy, and Lendacy would wire $70,000 to the investor making it appear Lendacy made the loan using its own funds.  The investor's

---

[66] Ex. 44, Vargas at ¶¶8-9; Ex. 5 at SEC-Consultiva-E-0059606-0059607.
[67] Ex. 5 at SEC-Consultiva-E-0059617.
[68] Ex. 1, Ivory at ¶¶11-14; Ex. 24.
[69] *Id*.
[70] Ex. 39, Gaur at 292:1-293:3.
[71] Ex. 1, Ivory at ¶¶11-14; Ex. 25.
[72] Ex. 1, Ivory at ¶¶8, 11.
[73] Ex. 39, Gaur at 292:1-293:3.
[74] Ex. 6, Locke at 32:9-25; 52:3-19.

KFYield monthly statement would reflect their $100,000 investment, plus any monthly profit or loss, even though only $30,000 was used pursuing KFYield's stated investment strategy. Most investors were not told KFYield assets were used to fund their or others' Lendacy loans.[75]

d.      KFYield's investment in Lendacy, the assets of which were unsecured loans primarily to Williams, significantly limits its ability to honor redemption requests to all investors equitably. Moreover, any redemptions made would further concentrate KFYield's assets in its illiquid investment in Lendacy.[76]

Furthermore, Defendants provided false account statements to investors regarding their holdings in Kinetic Funds.[77] Kinetic Funds' known assets are less than the aggregate amount reflected on investor account statements.[78]

Williams had ultimate authority for the false and misleading statements and omissions made orally and in documents provided to clients and prospective clients.[79]

C.      **The Misappropriation of Investor Funds**

Once investors invested in KFYield, Williams then misappropriated KFYield funds for the benefit of himself and othr business ventures.

<u>Payoff of Relative's Mortgage</u>.   In April 2015, Williams used $37,000 of KFYield funds, routed to Lendacy, to pay off the mortgage on his relative's house.[80] On April 29, 2015,

---

[75] *Id.*
[76] *See e.g.*, Ex. 21-24.
[77] Ex. 1, Ivory at ¶5-9 and Ex. D; Ex. 6, Locke 61:9-62:13.
[78] *Id.*
[79] Ex. 6, Locke 121:15-22, 132:19-22, 156:8-13, 172:13-174:8.
[80] Ex. 6, Locke at 96:9-16; Ex. 10; Pufahl at 139:12-141:5.

Williams executed a Lendacy "Credit Facility Agreement" reflecting a purported loan for $40,000. [81] The relative did not grant Lendacy a mortgage or any other consideration to Lendacy, and the Credit Facility Agreement was unsecured. [82]

Purchase of Real Property for Personal Use. In March 2017, Williams purchased for $1,512,575.50 three luxury apartments and two parking spaces for himself in San Juan, Puerto Rico. [83] Williams used KFYield funds, diverted to Lendacy, to pay for the properties. [84] Williams titled these properties in his name. [85]

Certain employees subsequently raised concerns to Williams about his use of KFYield funds to pay for the San Juan properties. [86] Williams responded by stating that he was expecting a future payout from the sale of an unrelated company and would pay KFYield back at that time. [87] After employees pressed the issue, Williams executed a Lendacy "Credit Facility Agreement" for a $1,517,000 loan. [88] Williams did not grant Lendacy a mortgage on the properties, and the Credit Facility Agreement is unsecured. [89]

Purchase of Commercial Property. In May 2018, Williams used at least $2,755,000 of KFYield funds, routed to Lendacy in the form of a Lendacy loan, to purchase a historic bank

---

[81] Ex. 46, Agreement between Lendacy and Williams for $40,000.
[82] *Id*.
[83] Ex. 6, Locke at 67:19-79:18, Ex. 10, Pufahl at 24:23-27:1; Ex. 21; Exs. 47-48, BMO Harris records showing fund transfers for purchase.
[84] *Id*.; Ex. 1, Ivory at ¶14.
[85] Ex. 9; Ex. 6, Locke at 64:23-65:2.
[86] Ex. 10, Pufahl at 33:2-19, 141:20-142:24.
[87] Ex. 10, Pufahl at 25:22-26:16.
[88] Ex. 21.
[89] *Id*.

building in Old San Juan, Puerto Rico.[90]  Williams titled the building in the name of his entity, Scipio, and executed a Lendacy "Credit Facility Agreement" on Scipio's behalf.[91]  Scipio did not grant Lendacy a mortgage on the property, and Williams did not guarantee repayment of the purported loan, which is unsecured.[92]

Funding of Williams' Other Companies.  In April 2019, Williams used $2,050,000 of additional KFYield funds in the form of two Lendacy loans to provide financial support to his outside business ventures.[93]  These expenses included, among others, paying for the development of KIH, an international financial entity in Puerto Rico, the development of an international exchange in Puerto Rico, and paying more than $600,000 for a multi-day event held to highlight and introduce KIH to the public at a luxury hotel in Puerto Rico.[94]  Williams executed two "Credit Facility Agreements" reflecting a total loan in the amount of $2,550,000 on behalf of his entity, LF42.[95]  Williams did not guarantee repayment of the purported loan, which is unsecured. [96]

---

[90] Ex. 1, Ivory at ¶14; Ex. 6, Locke at 79:21-92:1; Ex. 10, Pufahl at 71:24-72:8; Ex. 49, Contract of Option; Ex. 50, First Amendment to Contract of Option; Ex. 51, Purchase Agreement Term Extension; Ex. 52, Recorded deed for property; Ex. 27-28; Ex. 29.
[91] Ex. 22; Ex. 52.
[92] Ex. 22.
[93] Ex. 1, Ivory at ¶14; Exs. 23-24.
[94] Ex. 1, Ivory at ¶14; Ex. 10, Pufahl at 45:13-47:20, 101:24-118:2; Ex. 32, Mendez at 95:15-101:10, 99:21-100:10; Ex. 25.
[95] Exs. 23-24
[96] *Id.*

As of October 2019, Lendacy had at least $12.6 million in outstanding purported loans made with KFYield assets to Williams, his entities, and other investors.[97]  Of that amount, at least $6.8 million reflects outstanding loans from Williams and two of his entities.[98]

### D.   The Undisclosed Conflicts of Interest

Defendants had multiple conflicts of interest relating to the operation and management of Kinetic Funds:

a.      Defendants transferred investor capital amounting to at least $9.1 million net to Lendacy, an entity owned by Williams;[99]

b.      Williams and two of his entities took unsecured loans amounting to at least $6.8 million funded with KFYield assets;[100] and

c.      Between January 2015 and October 2017, Defendants used $30,872.44 of investor funds to pay Silexx Financial Systems, LLC ("Silexx"), another company that Williams partially owned and/or had a financial interest in.[101]

### E.   <u>Pending Redemption Requests</u>

Since September 2019, Kinetic Group has received at least $6.4 million in Kinetic Funds investor redemption requests.[102]  Williams retains exclusive authority over the payment of the redemptions.[103]  Because Kinetic Funds' liabilities exceed its assets as of January 2019

---

[97] Ex. 1, Ivory at ¶6 and Ex. B.
[98] Exs. 21-25.
[99] Ex. 1, Ivory at ¶11.
[100] Ex. 1, Ivory at Exs. B and E; Exs. 20-23.
[101] Ex. 1, Ivory at ¶12.
[102] Ex. 2.
[103] Ex. 7 at SEC-Consultiva-E -0061263, 0061268.

and because of those assets' limited liquidity, paying redemptions will severely disadvantage non-redeeming investors.[104]

## V.    **MEMORANDUM OF LAW**

### A.    **Standard for Obtaining An Asset Freeze Order**

The Court may order an asset freeze "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005). The Commission's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains" is all that is required. "Exactitude is not a requirement . . . ." *ETS Payphones*, 408 F.3d at 735 (citation and quotation omitted); *FTC v. IAB Marketing Associates, LP*, 746 F.3d 1228, 1234 (11th Cir. 2014). The Commission's burden to demonstrate the potential for dissipation of funds is even lighter. *FTC v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze") (internal citations omitted); *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) ("the SEC must demonstrate only . . . a concern that defendants will dissipate their assets . . . .").

The Court's power to freeze assets extends to relief defendants. *See CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010); *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *CFTC v. International Berkshire Group Holdings, Inc.*, 2006 WL 3716390, *10 (S.D. Fla. Nov. 3, 2006). A relief defendant is a party not charged with wrongdoing who nevertheless "possesses illegally obtained profits but has no legitimate claim to them." *SEC v. Huff*, 758 F. Supp. 2d

---

[104] Ex. 1, Ivory at ¶¶8, 10 and Ex. D; Ex. 2.

1288, 1362 (S.D. Fla. 2010), *aff'd on other grounds*, 455 F. App'x 882 (11th Cir. 2012) (unpublished). To obtain a freeze of a relief defendant's assets, the Commission "must demonstrate only that [it] is likely ultimately to succeed in disgorging the frozen funds." *Walsh*, 618 F.3d at 225.

The Commission's evidence in this case warrants entry of the requested asset freeze and other relief. The declarations, testimony transcripts, bank and brokerage records, marketing materials, and other exhibits attached to this motion demonstrate that Defendants are violating the antifraud provisions of the federal securities laws and, therefore, are liable to investors for disgorgement and unfit to ensure the return of investor funds.

**B.    Defendants Violated the Antifraud Provisions of the Securities Laws**

**1.    Misstatement Liability:  Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder**

Section 17(a)(2) of the Securities Act prohibits any person, in the offer or sale of a security, from directly or indirectly obtaining money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. A violation of Section 17(a)(2) can be shown by negligent conduct. *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).

Section 10(b) of the Exchange Act and Rule l0b-5(b) prohibit the making of (1) a false statement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of a security. *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007). A fact is material if there is a "substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest]." *Basic Inc.* v. *Levinson,* 485 U.S. 224, 231

(1988); *Finnerty v. Stiefel Labs., Inc.*, 756 F.3d 1310, 1321 (11th Cir. 2014).  The Eleventh Circuit has concluded scienter may be established by a showing of knowing misconduct or severe recklessness.  *ZPR Inv. Mgmt. Inc. v. SEC,* 861 F.3d 1239, 1252 (11th Cir. 2017); *SEC v. Carriba Air Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).  For purposes of Rule 10b-5(b), the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

### a.      Defendants Made False Statements In Connection with the Purchase or Sale of Securities

Investments into Kinetic Funds constitute investment contracts and, therefore, are securities.  *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10) (defining security to include investment contracts under the Securities Act and Exchange Act).  Under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), an investment contract exists if there is "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others."  *SEC v. Unique Financial Concepts*, 196 F.3d 1195, 1199 (11th Cir. 1999).  Here, investors provided Defendants with money for the purpose of investing in Kinetic Funds.  Commonality exists because investors were passive, relying on Defendants' purported skill in creating and managing a hedge fund that would generate income with little risk to principal.  *Id*. (applying a standard of "broad" vertical commonality, requiring only a finding that investors' fortunes were "inextricably tied to the efficacy of the [promoter].").  As for profits being derived "solely" from the efforts of others, "the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party."  *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 755 (11th Cir. 2007).  This prong is satisfied because

Defendants retained total control over Kinetic Funds' profitability.  All investors had to do was give Defendants their money and wait to receive income from their principal investment.

### b.  Defendants Knowingly Made Material Misrepresentations

Defendants told investors that KFYield would invest in U.S. listed financial products and hedge at least 90% of those holdings using listed options to ensure the safety and liquidity of investor capital.  Contrary to Defendants' representations, KFYield assets were not invested in U.S. listed financial products, the KFYield portfolio was not 90% hedged with listed options, and KFYield did not remain liquid.  Rather, Defendants transferred KFYield assets to Lendacy, which at Williams' direction, made "loans" to Williams, his entities, and other investors.

These misrepresentations were material.  *See e.g., SEC v. Smart*, 678 F.3d.850, 857 (10th Cir. 2012) (the fact money was not being used as represented would be material to a reasonable investor).  Instead of investing their funds as promised, Defendants used investor funds, to the tune of at least $6.3 million, to purchase real estate, to pay-off a relative's mortgage, to cover operating expenses and to fund other business ventures, among other things.

Williams knew his representations were false because he directed the transfer of KFYield assets to Lendacy, and Lendacy's subsequent "loans" to himself and his entities.

### 2.  Scheme Liability:  Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder

Defendants knowingly engaged in a scheme to defraud investors.  Scheme liability under Sections 17(a)(1) and 17(a)(3) and Rule 10b-5(a) and (c) generally requires a showing that the defendant committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud, with scienter (with respect to Section 17(a)(1) and Rules 10b-5(a) and (c))

or negligently (with respect to Section 17(a)(3)). *See SEC v. Morgan Keegan & Co., Inc.,* 678 F.3d 1233, 1244 (11th Cir. 2012).   The language of these provisions is "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019).   In *Lorenzo*, the Supreme Court recognized that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection. *Id.* at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

Here, Williams engaged in a long-running scheme designed to deceive investors. Williams, as the sole person in control of Kinetic Group, not only made material misrepresentations and omissions to investors, but also controlled the relevant bank accounts, made preferential payments to redeeming investors based on false account values that he created, and misappropriated at least $6.3 million of investor funds for his own personal enjoyment. *See SEC v. Zanford,* 535 U.S. 813, 821-22 (2002) (misappropriation of client's securities for personal use states a claim for scheme to defraud).   Williams' scienter can be imputed to Kinetic Group. *SEC v. Manor Nursing Centers, Inc*., 458 F.2d 1082, 1096 n.16 (2d Cir. 1972); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999) (finding that the scienter of corporate officers is properly imputed to the corporation).

### C.   Defendants Violated the Antifraud Provisions of the Advisers Act

Defendants violated Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder because they acted as an investment adviser while misrepresenting and

omitting material facts and engaging in the fraudulent conduct discussed above.   Section 202(a)(11) of the Advisers Act defines an  "investment adviser" "as any person who, for compensation, engages in the business of advising others … as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."  This definition includes a general partner of a hedge fund or investment manager of a limited partnership, such as Kinetic Group, which manages a fund's investments for compensation.  *See Abrahamson v. Fleschner*, 568 F.2d 862, 869-70 (2d Cir. 1977).  Williams carried out Kinetic Group's responsibilities as investment adviser and made certain of the investment decisions for Kinetic Funds for a 1% management fee.  Therefore, Williams meets the definition of an "investment adviser."  *See In the Matter of John J. Kenny*, Advisers Act Rel. No. 2128, 2003 WL 21078085, *17 n.54 (May 14, 2003).

The Supreme Court has held the Advisers Act establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients.  *Transamerica Mortgage Adviser, Inc. v. Lewis*, 444 U.S. 11, 17 (1979).  An adviser's fiduciary duties include "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts*." SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-94 (1963).  The duty to disclose all material information is intended "to eliminate, or at least expose, all conflicts of interest which might incline an investment adviser –consciously or unconsciously – to render advice which was not disinterested."  *Id.* at 191-92.  The existence of a conflict of interest is a material fact which an investment adviser must fully and fairly disclose to its client, so the client can understand the conflict and have a basis to consent to the conflict or reject it.  *Id*.

1.      __Scheme Liability:  Sections 206(1) and 206(2) of the Advisers Act__

Section 206(1) of the Advisers Act prohibits any investment adviser from, directly or indirectly, employing any device, scheme or artifice to defraud any client or prospective client. Section 206(2) of the Advisers Act prohibits any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client.  Scienter is required for a violation of Section 206(1), but not for Section 206(2).  *See Capital Gains*, 375 U.S. at 184, 191-92

Defendants violated Sections 206(1) and 206(2) of the Advisers Act. They misappropriated and misused investor funds to make purported loans to Williams and others, to fund Williams' other business ventures and to cover operating costs.  In addition, Defendants failed to disclose conflicts of interest, namely, that Williams diverted investor funds into Lendacy, an entity owned by him, and then directed Lendacy to make unsecured "loans" funded with KFYield assets to himself.

2.      __Misstatement Liability:  206(4) of the Advisers Act and Rule 206(4)-8 thereunder__

Section 206(4) of the Advisers Act, modeled on Sections 206(1) and (2) thereof, prohibits an investment adviser from, directly or indirectly, engaging in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.  Rule 206(4)-8 defines such prohibited conduct.  Under the Rule, advisers to "pooled investment vehicles," which include hedge funds such as Kinetic Funds, violate Section 206(4) if they make false or misleading statements to investors or prospective investors in those pools or otherwise defraud investors or prospective investors.  *Prohibition of Fraud by Advisers to Certain Pooled Investment*

*Vehicles* (SEC Rel. No. IA-2628, 2007 WL 2239114, *3 Aug. 9, 2007).  Scienter is not required – conduct that is negligently, recklessly, or deliberately deceptive is sufficient.  *Id.* at *5.

Defendants violated Section 206(4) of the Advisers Act and Rule 206(4)-8 by misrepresenting and omitting material facts concerning the use of investor funds.  As discussed above, Defendants stated that KFYield would invest in U.S. listed financial products and hedge at least 90% of those holdings using listed options to ensure the safety and liquidity of investor capital.  Defendants instead diverted a substantial portion of KFYield assets to Williams' start-up venture Lendacy, which proceeded to make purported loans to Williams, his entities and other investors.

### D.   Disgorgement is an Appropriate Remedy

 Disgorgement is warranted because Defendants, directly and indirectly through Relief Defendants, misappropriated at least $6.3 million from investors as detailed above.  *SEC v. Monterosso,* 756 F.3d 1326, 1337 (11th Cir. 2014) ("Disgorgement is an equitable remedy intended to prevent unjust enrichment."); *CFTC v. Gresham*, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012) ("'An individual may be a proper relief defendant even if she does not possess the actual ill-gotten gains if she previously received benefits that were derived from another person's unlawful conduct.'") (quoting *SEC v. Aragon Capital Advisors, LLC*, 2011 WL 3278907, *18 (S.D.N.Y. July 26, 2011)).

These "reasonable approximation[s] of the defendant[s'] unlawfully acquired assets . . . shift[] [the burden] to the defendants to demonstrate the SEC's estimate is not reasonable." *SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017).  The Commission need not trace a defendant's ill-gotten gains to assets currently possessed.  *See FTC v. Leshin*, 719 F.3d 1227,

1234 (11th Cir. 2013) ("[A] disgorgement order establishes a personal liability, which the defendant must satisfy regardless whether he retains the proceeds of his wrongdoing.") (citation and quotation omitted); *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1369 (S.D. Fla. 2006) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset . . . .") (citation and quotation omitted), *aff'd*, 240 F. App'x 355 (11th Cir. 2007).

  **E.**  **A Total Asset Freeze is Appropriate**

  The Court should freeze Defendants' assets to ensure that a disgorgement award can be satisfied and to prevent further dissipation of investor funds.  A total asset freeze is warranted when the assets to be frozen are worth less than the likely disgorgement award.  *See SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (unpublished) ("[I]f potential disgorgement is greater than the value of the defendant's assets, the district court can order a full asset freeze."); *ETS Payphones*, 408 F.3d at 735-36 (affirming order that "froze all of [defendant's] assets" when estimated disgorgement and value of frozen assets were comparable); *see also FTC v. RCA Credit Services*, *LLC*, 2008 WL 5428039, *4 (M.D. Fla. Dec. 31, 2008) (defendants "may not use their victims' assets to hire counsel to help them retain the fruits of their violations").

  Williams owns a residence in Puerto Rico (bought with investor funds) and recently received a substantial payment from a business venture.[105]  However, the Commission is not aware of Williams or Kinetic Group owning assets worth the $6.3 million disgorgement

---

[105] The freeze on the real estate should place no hardship on Williams:  the order would simply prevent him from selling or granting a mortgage on the property.

amount.

Furthermore, the Court should freeze the assets of Relief Defendants because they received investor capital transferred from Kinetic Funds. They thus will likely be subject to a disgorgement order as well because they lack any legitimate claim to the funds they received. *Walsh*, 618 F.3d at 226; *SEC v. George,* 426 F.3d 786, 798 (6th Cir. 2005). A contrary conclusion "would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving [assets] to friends and relatives." *SEC v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998). A freeze also would prevent the possibility of further dissipation of assets. Williams maintains control over Relief Defendants and their bank accounts. Absent a freeze, Williams would have the opportunity to remove Relief Defendants' ill-gotten assets, thereby depriving investors of funds that rightfully belong to them.

### F.    Sworn Accounting

In its Complaint, the Commission seeks disgorgement orders against all Defendants and Relief Defendants. Sworn accountings by Defendants and Relief Defendants are necessary to enable the Commission and the Court to more precisely determine the amounts Defendants have raised, spent, and transferred to Relief Defendants in perpetration of their fraud, and to better identify the amount of Defendants' and Relief Defendants' unjust enrichment as well as the assets available for disgorgement. *See SEC v. Lybrand*, 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000).

### G.    An Order Prohibiting Destruction of Records

An Order against Defendants prohibiting the destruction of records is warranted to prevent the destruction of documents before this Court can adjudicate the Commission's

claims, and to ensure that whatever equitable relief might ultimately be appropriate is available. *SEC v. Shiner*, 268 F. Supp. 2d 1333, 1345-46 (S.D. Fla. 2003).

      **H.**     **Expedited Deposition of Williams**

If Williams intends to testify during the hearing on this motion, the Commission requests an Order directing Williams to appear for deposition before the Commission at least three (3) business days prior to the hearing.

**VI.**    **CONCLUSION**

For the reasons set forth above, the Commission requests that the Court grant the Commission's Emergency Motion for Asset Freeze and Other Relief and enter the Commission's proposed order.

February 20, 2020                    Respectfully submitted,


By:      */s/ Christine Nestor & Stephanie N. Moot*
         Christine Nestor
         Senior Trial Counsel
         Fla. Bar No. 597211
         Direct Dial: (305) 982-6367
         E-mail: nestorc@sec.gov

         Stephanie N. Moot
         Trial Counsel
         Fla. Bar No.  30377
         Direct Dial:  (305) 982-6313
         E-mail: moots@sec.gov

         John T. Houchin
         Senior Counsel
         Fla. Bar No. 118966
         Direct Dial:  (305) 416-6292
         E-mail: houchinj@sec.gov

         Barbara Viniegra
         Senior Counsel
         Fla. Bar No.  716901
         Direct Dial:  (305) 416-6218
         E-mail: viniegrab@sec.gov

         Attorneys for Plaintiff
         **Securities and Exchange Commission**
         801 Brickell Avenue, Suite 1950
         Miami, FL 33131
         Facsimile: (305) 536-4154