UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff,

v.                                                      Case No: 8:20-cv-394-MSS-SPF

KINETIC INVESTMENT GROUP,
LLC, and MICHAEL SCOTT
WILLIAMS,

     Defendants, and

KINETIC FUNDS I, LLC,
KCL SERVICES, LLC d/b/a LENDACY,
SCIPIO, LLC,
LF42, LLC,
EL MORRO FINANCIAL GROUP, LLC, and
KIH, INC. f/k/a KINETIC INTERNATIONAL, LLC,

     Relief Defendants.

_____

**ORDER**

    **THIS CAUSE** comes before the Court for consideration of Defendant Michael

Scott Williams' Motion for Judgment on the Pleadings, (Dkt. 201), the response in

opposition thereto, (Dkt. 208), Plaintiff's Motion for Summary Judgment against

Defendant Michael Scott Williams, (Dkt. 200), the response in opposition thereto,

(Dkt. 221), and Plaintiff's Reply in Support of Motion for Summary Judgment. (Dkt.

227) The Court has also considered Defendant Michael Scott Williams' Motion for

Summary Judgment, (Dkt. 202), the response in opposition thereto, (Dkt. 219), and Defendant's Reply in Support of his Motion for Summary Judgment. (Dkt. 228)

Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** Plaintiff's Motion for Summary Judgment against Defendant Michael Scott Williams, **DENIES** Defendant Michael Scott Williams' Motion for Summary Judgment against Plaintiff, and **DENIES AS MOOT** Defendant Michael Scott Williams' Motion for Judgment on the Pleadings.

## I.    BACKGROUND

On February 2, 2020, Plaintiff Securities Exchange Commission ("SEC") initiated this action against Defendants and Relief Defendants for violations of Section 10(b) and Rules 10b-5(a)-(c) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a)-(c)] and Section 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1)-(3)] (collectively, the "Antifraud Provisions"). The SEC also alleges that the Defendants violated Sections 206(1), (2), and (4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1)-(2), (4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8], and that Defendant Michael Scott Williams ("Williams"), in the alternative, aided and abetted violations of the Advisers Act under Section 209(d), 15 U.S.C. § 80b-9(d).

The SEC contends that since at least 2013, Defendant Williams and Defendant Kinetic Investment Group, LLC ("Kinetic Group") (collectively, the "Defendants")

2

have raised at least $39 million from approximately 30 investors in an unregistered securities offering. (Dkt. 200 at 8) According to the SEC, Defendants solicited investors to invest in Relief Defendant Kinetic Funds I, LLC ("Kinetic Funds"), a purported hedge fund managed by Defendants. (Id.) The SEC claims that Defendants steered them toward Kinetic Funds' largest sub-fund, Kinetic Funds Yield ("KFYield"). (Id.) Defendants informed investors that their entire capital would be invested in income-producing U.S. listed financial products and that their principal would be secure because the KFYield portfolio would be hedged[1] with listed options. (Id.)

The SEC contends that contrary to this representation, Defendants diverted a substantial portion of KFYield investor capital to Relief Defendant KCL Services, LLC d/b/a Lendacy ("Lendacy"), a private start-up company owned by Williams. (Id.) Lendacy, however, was neither listed on a U.S. exchange nor capable of being hedged with listed options. (Id.) The SEC asserts that Williams then directed Lendacy to make purported loans using KFYield assets to himself, entities under his control, and others. (Id.) Those other entities under his control included Relief Defendants Scipio, LLC ("Scipio"), LF42, LLC ("LF42"), El Morro Financial Group, LLC ("El Morro"), and KIH, Inc. f/k/a/ Kinetic International, LLC ("KIH"). (Dkt. 1 at ¶ 5)

Since at least 2015, the SEC claims that Williams, through his ownership,

---

[1] "To hedge . . . is to take an offsetting position in an asset or investment that reduces the price risk of an existing position. A hedge is therefore a trade that is made with the purpose of reducing the risk of adverse price movements in another asset." See https://www.investopedia.com/terms/h/hedge.asp (last visited June 10, 2024)

control, and ultimate authority over Defendant Kinetic Group and the Relief Defendants, misappropriated at least $6.3 million of Kinetic Funds' assets, *i.e.,* investor capital, to fund other business ventures and to pay for personal expenses. (<u>Id.</u>)

### a.  The Offering Materials and Securities Transactions

Beginning in 2012, Williams, through Kinetic Group, offered Kinetic Funds as an investment opportunity for potential investors. (Dkt. 200 at ¶ 9) In 2016, Williams' operation expanded from Florida to Puerto Rico, where a second office was opened, and investors in Puerto Rico were then solicited to invest in Kinetic Funds. (Dkt. 200 at ¶ 20)

Kinetic Funds employs four investment strategies through sub-funds characterized as yield, gold, growth, and inflation. (<u>Id.</u>; Dkt. 200-1 at ¶ 8) The yield strategy, known as KFYield, has accounted for most (if not 98%) of Kinetic Funds' equity investments since Kinetic Funds was formed in 2012, and it is the subject of this lawsuit. (Dkt. 200-1 at ¶ 8; Dkt. 200 at ¶ 9)

Williams initially offered Kinetic Funds to his friends, partners, and associates. (Dkt. 200 at ¶ 10) However, over time, Williams began to solicit additional investors by using marketing brochures, websites, and referrals. (<u>Id.</u>) Williams did not utilize a private placement memorandum to provide disclosures to potential investors. (Dkt. 220 at ¶ 4)[2]

---

[2] A private placement memorandum is an offering memorandum that provides potential investors with the objectives, risks, and terms of an investment. <u>https://www.investopedia.com/terms/o/offeringmemorandum.asp#:~:text=An%20offering%20memorandum%2C%20also%20known,to%20understand%20the%20investment%20vehicle</u> (last visited Feb. 23, 2024).

Instead, to understand how Kinetic Funds operated, investors received (1) a copy of the Kinetic Funds Subscription Agreement ("Subscription Agreement"), (2) either Exhibit "B-1" or "C-1" to the Kinetic Funds Operating Agreement ("Operating Agreement"), which investors used to design the particular strategy they wanted to invest in, (3) the Kinetic Funds Offering Questionnaire ("Offering Questionnaire"), and (4) Kinetic Funds marketing brochures. (Dkt. 200 at ¶ 11; Dkt. 200-6) Some, if not all, investors received a copy of the Operating Agreement. (Dkt. 200 at ¶ 12; Dkt. 200-15 at 78:22-25) [3]

Investors were classified as either Class B or Class C Members. (Dkt. 200-6 at 5-14) Class B Members signed Exhibit B-1 of Kinetic Funds' Operating Agreement, which was used prior to the creation of Exhibit C-1. (Dkt. 221-2 at ¶ 70; Dkt. 200-15 at 138:25) Class C Members signed Exhibit C-1 (Dkt. 221-2 at ¶ 71), which was created for and executed by investors who had or would have a relationship with Lendacy, Williams' entity, in the future. (Dkt. 200-15 at 139:10-15) Some Class B Members may have had a relationship with Lendacy but did not sign Exhibit C-1 because that relationship would have preexisted the creation of Exhibit C-1. (Id. at 138:25-139:1-2) Once Exhibit C-1 was created, however, investors who did not have a relationship with Lendacy would exclusively sign Exhibit B-1. (Id. at 139:16-19)

As explained above, Lendacy provided lines of credit, *i.e.,* loans, to accredited investors. Williams claims that "as a service and benefit to Kinetic Funds' investors,"

---

[3] The Court cites to Williams' deposition, (Dkt. 200-15), according to the page and line numbers provided by the court reporter.

Kinetic Funds "worked with Lendacy to offer Kinetic Funds' investors the ability to borrow up to 70% of the value of their investment in Kinetic Funds at substantially reduced interest rates to use however the investors might wish – e.g., to buy a home, to invest in a business, to pay a debt, etc." (Dkt. 221-2 at ¶ 136)

Exhibit C-1 to the Operating Agreement provides the following: "All Funds may include a 'Preferred Return' investment. This investment is in a private sector funding company that offers fixed[-]rate preferred interest returns . . . ." (Dkt. 220 at ¶ 5) Exhibit C-1 does not identify the "preferred return investment" or the "private sector funding company." (Id. at ¶ 6) Exhibit C-1 does not identify Williams as the majority owner of Lendacy and does not disclose that Williams or his entitles would receive purported loans from Lendacy. (Id. at ¶¶ 7-8) Exhibit B-1 omits the Preferred Return Provision entirely. (Id. at ¶ 9)

Exhibits B-1 and C-1 also provide that KFYield focuses on "income generation," that investors can make principal withdrawal requests under certain conditions, and that an annual 1% management fee will be charged to the funds of both Class B and Class C members. (Dkt. 200-6 at 6-8, 11-13)

Typically, when investing in Kinetic Funds, investors were required to complete the Offering Questionnaire and sign both the Subscription Agreement and either Exhibit B-1 or C-1 to the Operating Agreement. (Dkt. 200 at ¶ 16) The Subscription Agreement provides that an investor "irrevocably subscribes for a membership interest" in Kinetic Funds. (Id. at ¶ 17) Exhibits B-1 and C-1 state that an investor agrees to invest in at least one of the Kinetic Funds investment strategies and that the

Class A Member "will have full and complete discretion to make any and all trading decisions and affect any strategies as the Class A Member shall determine, in its sole and absolute discretion, in order to manage the Funds." (Id.) The Class A Member is defined as Kinetic Partners, LLC, of which Williams is the managing member. (Dkt. 200-6 at 6, 11; Dkt. 200 at 9) Kinetic Partners, LLC was also a managing member of Kinetic Funds. (Dkt. 200-13)

### b. Williams' Alleged Misappropriation of Investor Funds, Misrepresentations and Omissions, Schemes to Defraud, and Conflicts of Interest

Kinetic Funds' BMO Harris Bank N.A. bank account held all the investor capital. (Dkt. 200 at ¶ 38) The Commission claims that the account exclusively held investor capital, (Dkt. 200 at ¶ 38), which Williams denies. (Dkt. 221 at 15) Williams admits, however, that he kept a portion of investor capital in the Kinetic Funds' bank account and transferred the remainder to KFYield's Interactive Brokers LLC ("IB") ("Brokerage Account"). (Dkt. 220 at ¶ 18)

Securities for KFYield were then purchased with a combination of investor capital and margin, i.e., funds borrowed from its broker, IB. (Id. at ¶ 19) For example, if an investor provided $1 million for investment in Kinetic Funds, $1 million worth of securities would be purchased for that investor with a combination of cash and portfolio margin. (Id. at ¶ 20)

Margin is a debt that carries interest. (Id. at ¶ 21) If Kinetic Funds' Brokerage Account fell below the minimum maintenance margin, then IB, at its sole discretion

could issue a margin call, *i.e.* require Kinetic Funds to put more cash into the Brokerage Account, purchase more options, or liquidate some of its positions. (Id. at 22)

The Commission claims that Williams chose to purchase securities for the KFYield portfolio with a mix of cash and margin so that investor assets left behind in Kinetic Funds' bank account could be directed to Lendacy and other private equity, which Williams disputes. (Dkt. 200 at ¶ 41; Dkt. 221 at 15)

Williams created the investment strategy for Kinetic Funds, (Dkt. 220 at ¶ 23), and controlled the Brokerage Account, including its operation and trading activity. (Dkt. 200 at ¶ 42) IB only held greater authority than Williams with respect to closing trades and with respect to any issues related to margin trading. (Dkt. 221 at 15) Williams had ultimate authority over Kinetic Funds' investment decisions, with the assistance of Anadi Guar ("Guar"), to whom Williams delegated the duty of executing day-to-day trades in accordance with Williams' investment strategy. (Dkt. 200 at ¶ 42) Williams, however, had the authority to fire Guar (Dkt. 200-15 at 71:24-25; 72:1, 86:21-22), and Guar reported to Williams. (Dkt. 200 at ¶ 42) Williams further had control over Kinetic Funds' bank account and controlled Lendacy's two bank accounts at BMO Harris Bank N.A. (Id. at ¶ 43)

The SEC alleges Williams engaged in the following misappropriations:

- **Payoff of Relative's Mortgage:** In April 2015, Williams used $37,000 of KFYield funds, routed to Lendacy, to pay off the mortgage on his mother's house. (Dkt. 200 at ¶ 44)

8

- **Purchase of Real Property for Personal Use:** In March 2017, Williams purchased three luxury apartments and two parking spaces for himself in San Juan, Puerto Rico, for $1,512,575.50 (Id. at ¶ 45) Williams used KFYield funds, which had been diverted to Lendacy, to pay for the properties. (Id.)

- **Purchase of Commercial Property:** In May 2018, Williams used at least $2,755,000.00 of KFYield funds, routed to Lendacy in the form of a Lendacy loan, to purchase a historic bank building in Old San Juan, Puerto Rico, on behalf of his entity, Relief Defendant Scipio. (Id. at ¶ 47) Williams titled the building in the name of his entity, Scipio. (Id.)

- **Funding of Williams' Other Companies:** In April 2019, Williams used $2,550,000.00 of additional KFYield funds in the form of two Lendacy loans on behalf of his entity, Relief Defendant LF42, LLC ("LF42"), to provide financial support to his outside business ventures. (Dkt. 200 at ¶ 48) Those business ventures included: (1) the development of Relief Defendant KIH, an international financial entity in Puerto Rico; (2) the development of an international exchange in Puerto Rico; and (3) the payment of more than $600,000 for a multi-day event to highlight and introduce KIH to the public at a luxury hotel in Puerto Rico. (Id.)

The SEC claims that Williams engaged in the following additional devices, schemes, and artifices to defraud: (1) Williams executed the loan agreements with

Lendacy *after* already purchasing the luxury apartments and parking spaces for his personal use with investor assets; (2) Williams executed loan agreements with Lendacy *after* he had already used investor assets to fund the development of KIH and the international exchange, and to pay for the multi-day event; and (3) Williams purchased securities for the KFYield portfolio on margin so he could divert investor capital to Lendacy. (Dkt. 200 at ¶¶ 50-52) In addition, the SEC asserts that Williams papered a promissory note to make it look as though the assets of LF42 funded ISX, LLC ("ISX"), which was a technology company that Williams held a 40% interest in. (Id. at ¶ 51) ISX created the software for the international exchange referenced above. (Id.) However, according to the SEC, $2 million of *investor* assets, routed through Lendacy, were transferred to ISX. (Id.)

The SEC next claims that Williams made multiple material misrepresentations and/or omissions in the materials that investors received, which are broken down into the following ten categories as follows:

- **Lendacy's Funding Source:** First, Williams led prospective investors to believe Lendacy had a separate funding source that would finance the loan from Lendacy to the investor, and Williams led investors to believe that their entire capital would be invested in KFYield. (Dkt. 200 at ¶ 26) However, Williams instead used KFYield assets, not a separate funding source, to fund Lendacy and the undisclosed loans that it made to Williams and his entities. (Id. at ¶ 27)

10

- **Williams' Ownership of Lendacy:** Second, Williams failed to disclose to most investors that their assets would be invested "in a private sector funding company that offers fixed-rate preferred interest returns" and that the company was Lendacy, which was owned and controlled by Williams. (Id. at ¶ 34)

- **Income-producing U.S. Listed Financial Products:** Third, contrary to the representation made to investors, Williams did not invest all investor funds in U.S.-listed financial products, and since at least 2013, Williams diverted a substantial portion of investor capital to his entity, Lendacy. (Dkt. 200 at ¶ 23)

- **Secure Principal**: Fourth, Williams advised investors that KFYield was a conservative blended fund and that their principal would be secure because the KFYield portfolio would be hedged with listed options. (Dkt. 220 at ¶ 13) However, Williams failed to hedge at least 90% of KFYield's portfolio using listed options. (Dkt. 200 at ¶ 25)

- **Liquidity**: Fifth, Williams claimed that KFYield assets had liquidity. (Id. at ¶ 28) However, KFYield's investment in Lendacy, which consisted of unsecured loans primarily for the benefit of Williams, significantly limited Kinetic Funds' ability to honor redemption requests to all investors equitably. (Id. at ¶ 29)

- **Account Statements:** Sixth, the known assets of Kinetic Funds were less

11

than the aggregate amount reflected on investor account statements. (Id. at ¶ 30)

- **Portfolio Performance:** Seventh, KFYield's reported performance to investors did not match its actual performance. (Id. at ¶ 31)

- **Margin:** Eighth, Williams failed to disclose to investors what portion of Kinetic Funds' portfolio was margined. (Id. at ¶ 33)

- **Williams' Purported Loans:** Ninth, Williams failed to disclose to investors that he and his entities, Scipio and LF42, received purported loans from Lendacy. (Id. at ¶ 35)

- **Zephyr Aerospace:** Tenth, Williams failed to disclose that he used at least $497,300.00 of investor assets to invest in Zephyr Aerospace, a private company that was not listed on a U.S. exchange. (Id. at ¶ 36)

The SEC contends that Williams engaged in at least three conflicts of interest in failing to adhere to the promises made in the materials provided to investors. First, Williams transferred at least $9.1 million of investor capital to Lendacy, an entity owned by him. (Id. at ¶ 53). Second, Williams and two of his entities took at least $6.3 million in unsecured loans funded with investor assets. (Id. at ¶ 54) Third, between January 2015 and October 2017, Williams used $30,872.44 of investor funds to pay Silexx Financial Systems, LLC ("Silexx"), which is another company that Williams partially owned and/or had a financial interest in. (Id. at ¶ 55)

12

### c. Procedural History

When the SEC filed the instant Complaint (Dkt. 1) on February 2, 2020, it simultaneously filed an Emergency Motion for Asset Freeze and Other Relief (Dkt. 2) and an Emergency Motion for Appointment of Receiver. (Dkt. 3) A hearing was held on March 6, 2020, in which United States District Court Judge William F. Jung granted the Emergency Motion for Asset Freeze, freezing the assets of the Defendants and Relief Defendants. (Dkt. 33) The Court found that the "SEC ha[d] made a sufficient and proper showing in support of the relief granted herein by presenting a *prima facie* case showing a reasonable approximation of the likely disgorgement award against the Defendants and Relief Defendants, which exceeds the amount of assets to be frozen." (Id. at 2) The Court found that if it failed to impose an asset freeze, "Defendants and Relief Defendants could dissipate, conceal, or transfer from the jurisdiction of this Court assets that are likely subject to an Order of Disgorgement." (Id.)

The Court further granted the SEC's Emergency Motion for an Appointment of Receiver, finding that, "based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Defendant Kinetic Group and the Relief Defendants that: (a) are attributable to funds derived from investors or clients of the Defendant; (b) are held in constructive trust for the Defendant; (c) were fraudulently transferred by the Defendant; and/or (d) may otherwise be includable as assets of the estates of the Defendant." (Dkt. 34)

On May 28, 2020, the SEC filed a Motion for Entry of Judgment of Permanent Injunction and Other Relief against Defendant Kinetic Group, LLC, and Relief Defendants. (Dkt. 86) The Receiver consented to the motion. (Id.) The Court granted the SEC's Motion on November 5, 2020, and entered judgment in favor of the SEC against the Defendant Kinetic Group and Relief Defendants. (Dkts. 151, 156)

On March 12, 2021, the SEC moved for summary judgment against Williams. (Dkt. 200) Williams simultaneously filed a motion for judgment on the pleadings (Dkt. 201) and a separate cross-motion for summary judgment against the SEC. (Dkt. 202) Both the SEC and Williams filed oppositions (Dkts. 219, 221) and replies in further support of their respective motions for summary judgment. (Dkts. 227, 228) The SEC also filed its opposition to Williams' motion for judgment on the pleadings. (Dkt. 208) All three motions are now ripe for review.

## II.    STANDARD OF REVIEW

### a. Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed. Fed R. Civ. P. 12(c). Rule 12(h)(2) permits the defense of failure to state a claim upon which relief can be granted to be raised in a motion for judgment on the pleadings under Rule 12(c). Fed. R. Civ. P. 12(h)(2). A motion under Rule 12(c) is "governed by the same standards as a motion to dismiss under Rule 12(b)(6)." United States v. Bahr, 275 F.R.D. 339, 340 (M.D. Ala. 2011). Thus, when evaluating a motion under Rule 12(c), the Court "accept[s]

the facts in the Complaint as true and view[s] them in the light most favorable to the nonmoving party." Ortega v. Christian, 85 F.3d 1521, 1524 (11th Cir. 1996).

"Judgment on the pleadings under Rule 12(c) is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." Horsley v. Rivera, 292 F.3d 695, 700 (11th Cir. 2002) (citing Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998)). "If upon reviewing the pleadings it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations, the court should dismiss the complaint." Id. (citing White v. Lemacks, 183 F.3d 1253, 1255 (11th Cir. 1999)).

### b. Motion for Summary Judgment

The Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001) (explaining that "[s]ummary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law"). For a factual dispute between the parties to defeat summary judgment, the factual dispute must be "both genuine and material." Miccosukee Tribe of Indians of Fla. v. United States, 516 F.3d 1235, 1243 (11th Cir. 2008). A fact is material if it "affect[s] the outcome of the suit under the governing law," and is genuine "if a reasonable trier of fact could return judgment for the non-moving party." Id.

A court will "construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [the court will] credit the non[-]moving party's version." Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006). The role of the jury is to weigh the evidence and determine credibility, "[t]herefore, if the determination of the case rests on which competing version of the facts or events is true, the case should be submitted to the trier of fact and the motion for summary judgment denied." Hodgetts v. City of Venice, Fla., 794 F. Supp. 2d 1265, 1271 (M.D. Fla. 2011).

A moving party discharges its burden on a motion for summary judgment by pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted). When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320-1321 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value."). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

16

Cross motions for summary judgment do not change the standard. <u>Westport Ins. Corp. v. VN Hotel Grp., LLC</u>, 761 F. Supp. 2d 1337, 1341 (M.D. Fla. 2010) (citing <u>Latin Am. Music Co. v. Archdiocese of San Juan of Roman Catholic & Apostolic Church</u>, 499 F.3d 32, 38 (1st Cir. 2007)). Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." <u>Shaw Constructors v. ICF Kaiser Eng'rs, Inc.</u>, 395 F.3d 533, 538-39 (5th Cir. 2004).

## III.   DISCUSSION

### A.   DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Williams argues that the Complaint should be dismissed because the SEC has failed to satisfy Rule 9(b)'s heightened pleading standard. (Dkt. 201) Williams also contends that the SEC has failed to state a claim upon which relief may be granted because the SEC has not properly alleged the specific statutory elements for the counts at issue. Last, Williams asserts that the Complaint should be dismissed with prejudice because the deadline to amend pleadings has passed, and the SEC "elected not to amend its Complaint before the deadline." (Dkt. 201 at 2)

"Under Federal Rule of Civil Procedure 12(c), a court has the discretion to convert a motion for judgment on the pleadings into a motion for summary judgment and proceed under Rule 56, so long as the nonmoving party is given notice and an opportunity to respond." <u>Hagerman v. Cobb County, Ga.</u>, 2008 U.S. Dist. LEXIS 24972 at *7 (N.D. Ga. Mar. 28, 2008) (quoting Fed. R. Civ. P. 12(c)). However, here there is no need to convert the motion to one for summary judgment because the

summary judgment motion has been filed along with the motion for judgment on the pleadings. Id.

As such, the Court will only consider the motions for summary judgment, which were filed "following the conclusion of the discovery period." Id. "In short, while inadequacies may have existed in the allegations set out in the Complaint and while these inadequacies may support the motion for judgment on the pleadings, the Court does not address them, but instead looks to the undisputed facts in the record to determine whether summary judgment is warranted" for either the SEC or for Williams. See id.

### B.   THE MOTIONS FOR SUMMARY JUDGMENT

While the Court considers each motion separately and on its own merits, the Parties offer nearly identical arguments in support of their respective motions and in response to the opposing party's motion. As such, the Court proceeds by analyzing the motions together.

### 1.   DEFENDANT'S EVIDENTIARY OBJECTIONS TO THE DECLARATIONS OF CRYSTAL IVORY

Defendant objects to the SEC's reliance on the Declarations of Crystal C. Ivory, a Certified Public Accountant ("CPA") employed as a Senior Staff Accountant by the SEC. The SEC first filed Ms. Ivory's Declaration in support of its motion for summary judgment against Williams. (Dkt. 200-24, "Declaration One") The SEC then filed

18

another Declaration from Ms. Ivory in support of its opposition to Williams' motion for summary judgment. (Dkt. 219-2, "Declaration Two")

In both Declarations, Ms. Ivory purports to provide support for the SEC's claim that Williams misappropriated investor funds and engaged in multiple misrepresentations and omissions. Williams argues that the Court should exclude both Declarations from consideration because they are hearsay and rely on hearsay/unauthenticated documents. (Dkt. 221; Dkt. 221-1; Dkt. 228 at 6-7) Furthermore, Williams explains that Ms. Ivory has not been identified as an expert witness. (Dkt. 221; Dkt. 221-1; Dkt. 228 at 6-7) Upon review, the Court concludes that both Declarations may be used, in part, for purposes of resolving the motion for summary judgment.

In support of Declaration One, Ms. Ivory reviewed the following documents: (a) the bank account statements for Kinetic Funds and Lendacy from the period of January 2015 through October 2019; (b) a copy of a spreadsheet entitled "Copy of Monthly transactions – Kinetic Funds I, LLC," produced to the SEC in November 2019; (c) a report from Lendacy as of October 2019 reflecting outstanding purported loans and amounts, which was produced to the SEC in October 2019; (d) an Activity Statement from IB regarding Kinetic Funds' Master account, produced to the SEC in December 2019; (e) investor statements as of January 2019, produced to the SEC in May 2019; and (f) a printed spreadsheet showing transfers made to Williams or Williams' entities, produced to the SEC on May 20, 2019. (Dkt. 200-24 at ¶ 4)

As explained in Declaration One, Ms. Ivory's analysis of these materials

allowed her to: (1) determine the total cash held in the bank accounts of Kinetic Funds and Lendacy, as well as the total outstanding Lendacy loan balance as of October 2019; (2) determine the total net asset value for Kinetic Funds' brokerage account, IB, as of October 2019; (3) determine the total number of investors and investor proceeds received by Kinetic Funds from January 2013 through October 2019, and Williams' total investment into Kinetic Funds; (4) determine the percentage of investor assets held in KFYield fund; (5) identify and determine the total amount of funds transferred from Kinetic Funds to Lendacy; (6) identify and determine the total payments made to Silexx between January 2015 and October 2017; (7) identify and determine the total payments made to an individual named Margery J. King, a relative of Williams; and (8) trace and agree a list of specified transactions to Kinetic Funds or Lendacy bank records. (Id. at ¶ 3)

In Declaration Two, Ms. Ivory reviewed the same bank account statements referenced above for Kinetic Funds and Lendacy from the period of January 2015 through October 2019. (Dkt. 219-2 at ¶ 4) Ms. Ivory's analysis of these materials allowed her to: (1) identify and determine the source of funds into the Kinetic Funds and Lendacy bank accounts between January 2015 and September 2019; (2) identify and determine the total funds received from IB between January 2015 and September 2019 and the last payment received into Kinetic Funds and/or Lendacy bank accounts from IB; (3) identify and determine the total Lendacy credit line draws to investors between November 2016 and September 2019; and (4) identify and determine the total net payments to Kinetic Group from Kinetic Funds and Lendacy bank accounts

between January 2015 and September 2019.

### a.    MS. IVORY'S DECLARATIONS ARE NOT HEARSAY.

To the extent Williams urges the Court to ignore Ms. Ivory's Declarations on the basis of hearsay, the Court finds that argument unpersuasive. The general rule is that "inadmissible hearsay cannot be considered on a motion for summary judgment." Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999). However, the Eleventh Circuit has "restated the general rule to hold that a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Id. The phrases "reduced to admissible evidence at trial" and "reduced to admissible form" have been used "to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose." Id. (explaining that the statement "might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as a substantive defense)").

Here, the bank records relied upon by Ms. Ivory, even if hearsay, could likely be "reduced to admissible form" at trial. See id. The SEC could offer testimony or other evidence establishing that Kinetic Funds' bank account, Lendacy's bank account, and IB's brokerage account statement fall within the business records exception to the hearsay rule; the SEC can call Williams to testify about the

21

transactions the records reflect[4]; or the SEC may do both. See Conservit, Inc. v. Global Mill Supply, Inc., No. 1:19-cv-274-ELR, 2023 U.S. Dist. LEXIS 58778 at *7 n.8 (N.D. Ga. Jan. 5, 2023) (assuming without deciding that the defendant's corporation's bank records are hearsay, but concluding that Plaintiff could likely "reduce [them] to admissible form" at trial by offering testimony or other evidence establishing that the [defendant corporation's] bank records fall within the business records exception to the hearsay rule, calling either of the [defendants] to testify about the transactions the records reflect, or both").

The other documents relied upon by Ms. Ivory can also be "reduced to admissible form" at trial. See Macuba, 193 F.3d at 1322. As both Lendacy and El Morro Financial are Williams' entities, the SEC can call Williams to testify about the Lendacy report reflecting outstanding purported loans and amounts as of October 2019, (Dkt. 200-24 at 15), as well as the Investor Statements from Kinetic Group, which were generated by Relief Defendant El Morro Financial, (Dkt. 200-25 at 31-40; Dkt. 200-26 at 1-26). See Conservit, Inc., 2023 U.S. Dist. LEXIS 58778 at *7 n.8. The "KF Transactions" spreadsheet, which provided the monthly transactions of Kinetic Funds as of November 21, 2019, was created by Ms. Locke, whom the SEC can also call to testify about the document. (Dkt. 200-24 at 8-13)

---

[4] In Williams' Responses to the SEC's First Request for Admissions, Williams contends that he did not control Lendacy, but was simply "a majority owner of, and a passive investor in, Lendacy." (Dkt. 200-14 at ¶ 5) Williams claims that Kelly Locke, the president of Lendacy, "managed and operated Lendacy independently from, and without any involvement of, [Williams]." (Id.) Even if true, the SEC can call Ms. Locke to testify about the Lendacy report reflecting the outstanding purported loans and amounts as of October 2019.

Ultimately, however, Ms. Ivory's Declarations can be reduced to non-hearsay form at trial by calling Ms. Ivory herself to testify. See <u>Smith v. LePage</u>, 834 F.3d 1285, 1296 n.6 (11th Cir. 2016) (noting that one way to reduce hearsay to admissible form is to have "the hearsay declarant testify directly to the matter at trial" (quoting <u>Jones v. UPS Ground Freight</u>, 683 F.3d 1283, 1293-94 (11th Cir. 2012))). As such, the Court does not find that Ms. Ivory's Declarations should be excluded on the basis of hearsay.

### b.  WHETHER MS. IVORY'S DECLARATIONS WERE EXPERT REPORTS.

Declaration One is separated into four sections of analysis: (1) Asset Balances of Kinetic Funds and Lendacy as of October 2019; (2) Investors and Investor proceeds; (3) Transfers and Payments; and (4) Specified Transactions. (Dkt. 200-24 at ¶¶ 5-14) Declaration Two is similarly separated into four sections of analysis: (1) Source of Funds; (2) Receipts from IB; (3) Lendacy Credit Line Draws; and (4) Net Payments made to Kinetic Group. (Dkt. 219-2 at ¶¶ 5-10)

Federal Rule of Evidence 1006 provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation." Fed. R. Evid. 1006. When a chart or summary of evidence "does not contain complicated calculations requiring the need of an expert for accuracy, no special expertise is required in presenting the chart," and thus a lay witness may establish the foundation for admission of the summary evidence under Rule 1006. <u>United States v. Jennings</u>, 724 F.2d 436, 442 (5th Cir. 1984).

In both Declarations, Ms. Ivory performed calculations that did not require expertise. For example, in Declaration One, in the first section entitled "Asset Balances," she added numbers together to determine the total assets of Kinetic Funds and Lendacy from numbers that were provided to her through bank statements and a Lendacy report showing total outstanding loans. (Dkt. 200-24 at ¶¶ 5-8) In the second section entitled "Investors and Investor Proceeds," Ms. Ivory determined the total number of investor proceeds by adding together each investor's contribution to the KFYield fund. (Id. at ¶¶ 9-10) In the third section entitled "Transfers and Payments," she reviewed the bank statements of Kinetic Funds and Lendacy to determine how much money was sent to Lendacy from Kinetic Funds and vice versa, and then subtracted those numbers to determine the net amount of money transferred from the Kinetic Funds' bank account to the Lendacy bank accounts. (Id. at ¶ 11) Further, she reviewed Kinetic Funds' bank statement and determined that $30,872 was paid to Silexx by adding each check amount made to Silexx from Kinetic Funds. (Id. at ¶ 12)

In Declaration Two, Ms. Ivory performed similar calculations involving division, addition, and subtraction of numbers. (Dkt. 219-2 at ¶¶ 5-10) In both Declarations, she provided a summary or a chart in support of her findings. None of these calculations required a level of expertise reserved solely for a CPA. See SEC v. Seghers, 298 F. App'x 319, 326 (5th Cir. 2008) (finding that witness providing summary testimony "[need not] be qualified as an expert because the production of the chart required her only to add values listed on various statements and divide the totals to calculate a percentage"); see also United States v. Milkiewicz, 470 F.3d 390,

401 (1st Cir. 2006) (finding that summarizing the financial information contained in the charts, including invoices, checks, and other documents "took patience but not expertise").

However, with respect to section four in Declaration One, regarding "Specified Transactions," the Court finds that Ms. Ivory should have been identified as an expert in order to permit her to trace and reconcile a list of specified transactions to the bank records of Kinetic Funds and Lendacy. (Dkt. 200-24 at ¶ 14) In any event, as described below, Mr. Williams admits to having received loans from Lendacy on behalf of himself and his entities in the precise (or near exact) amounts noted by Ms. Ivory. Thus, the Court need not, and does not, consider this portion of Ms. Ivory's Declaration for purposes of resolving the SEC's motion for summary judgment.

Federal Rule of Civil Procedure 26 requires that "[a] party must make [expert witness] disclosures at the times and in the sequence the court orders." Fed. R. Civ. P. 26(a)(2)(D). In order to make a proper disclosure, parties must, by the deadline, disclose the identity of their experts "accompanied by a written report." Fed. R. Civ. P. 26(a)(2)(B). This written report "must contain a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)—(ii). If a party violates Rule 26(a), Rule 37(c) provides for the exclusion of the expert evidence "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); see also OFS Fitel, LLC v. Epstein, Becker, and Green, P.C., 549 F.3d 1344, 1363 (11th Cir. 2008) ("Under Rule 37(c)(1), a district court clearly has authority to

25

exclude an expert's testimony where a party has failed to comply with Rule 26(a) unless the failure is substantially justified or harmless.").

"Substantially justified" for Rule 37(c)(1) means "reasonable people could differ as to the appropriateness of the contested action." Griffin v. United States, No. 3:19-cv-441-MMH-PDB, 2021 U.S. Dist. LEXIS 144928 at * 42 (M.D. Fla.  June 25, 2021) (citations omitted). As for the definition of "harmless," "[t]he meaning of 'harmlessness' for Rule 37(c)(1) is unsettled in the Eleventh Circuit." Treminio v. Crowley Mar. Corp., No. 3:22-cv-174-CRK, 2023 U.S. Dist. LEXIS 209411 at *10 (M.D. Fla. Nov. 22, 2023) (citations omitted). Notably, in Crawford v. ITW Food Equip. Grp., LLC, 977 F.3d 1331, 1342-43, 1353-54 (11th Cir. 2020), a majority of the court declined to decide the meaning of "harmless" for Rule 37(c)(1), "while a dissenting judge expressed the view that, considering the purpose of the disclosure and supplementation rules and the advisory committee notes to Rule 37(c)(1), non-compliance with those rules is harmless only if the non-compliance was a mistake and the information was already known to the opposing party." Griffin, 2021 U.S. Dist. LEXIS 144928 at *42 (citation omitted). However, "other circuits continue to apply pre-Rule 37(c)(1), judicially created, non-exhaustive factors to determine substantial justification or harmlessness. Those factors are the explanation for the failure, the importance of the witness's testimony, the need for time to prepare to respond to the testimony, and the possibility of a continuance." Id. at *42-43 (citing Murphy v. Magnolia Elec. Power Ass'n, 639 F.2d 232, 235 (5th Cir. 1981); accord Alimenta (U.S.A.), Inc. v. Anheuser-Busch Cos., Inc., 803 F.2d 1160, 1163 (11th Cir. 1986)).

Although the Eleventh Circuit has not provided a clear definition of "harmless," courts within the Middle District of Florida have found that a harmless failure to disclose exists "when there is no prejudice to the party entitled to receive the disclosure." <u>Baldeo</u>, 2014 U.S. Dist. LEXIS at *8 (quoting <u>Hewitt v. Liberty Mut. Group, Inc.</u>, 268 F.R.D. 681, 683 (M.D. Fla. 2010)).

Here, using the bank account statements from Kinetic Funds and Lendacy, and based on a review of a spreadsheet showing a list of transfers made to Williams and his entities, Ms. Ivory states that she was able to "trace and agree approximately $6.3 million in transfers to bank records." (Dkt. 200-24 at ¶ 14) She states that she used transaction details such as the transaction date, amount, payee, and transaction type (e.g., wire, internal transfer, etc.) in order to trace and agree the transfers to the bank records. (<u>Id.</u>) Specifically, the records demonstrated that on March 23, 2017, Lendacy wire transferred $1,512,575.50 to Williams so that he could purchase three luxury apartments and two parking spaces. (Dkt. 200-24 at 6) On May 4, 2018, Lendacy wire transferred $2,755,000.00 to Williams' entity, Scipio, in order for Williams to purchase a historic bank building in Old San Juan, Puerto Rico. (<u>Id.</u>) In April 2019, Lendacy transferred another $2,550,000.00 to LF42, another of Williams' entities, in order for LF42 to pay Williams' other entities, El Morro and KIH, for general operating expenses, to fund start-up costs for KIH, and to partially fund a multi-day launch event for KIH. (<u>Id.</u>; <u>see</u> <u>also</u> Dkt. 200 at ¶¶ 6-8)

Having conducted a tracing analysis, Ms. Ivory acted as an expert, and thus she should have been identified as such. <u>See</u> <u>FTC v. Am. Precious Metals, LLC</u>, 726 Fed.

App'x 729, 733 (11th Cir. 2018) (finding that an independent forensic accountant was acting as an expert when "she conducted a tracing analysis" to determine whether the defendant used any fraudulently obtained funds to pay his mortgage or other expenses related to his home).[5] Further, the SEC, as the party facing the sanction of exclusion of its purported expert's report, does not explain how its failure to disclose Ms. Ivory as an expert was "substantially justified" or "harmless." See Crawford, 977 F.3d at 1356 (noting that "the burden is on the rule-breaking party to" "show harmlessness" or "substantial justification") (citations omitted). Thus, the Court declines to consider this portion of Ms. Ivory's report for purposes of resolving the SEC's motion for summary judgment.

Instead, the Court relies on Williams' Declaration, wherein he devotes forty-one (41) paragraphs, in a section entitled "Williams' Lendacy loans," admitting to having received loans from Lendacy on behalf of himself and his entities in the precise (or near exact) amounts noted by Ms. Ivory. (See Dkt. 221-2 at ¶¶ 169-210) As explained below, it is clear that the crux of Williams' dispute is not that Lendacy did not provide loans to him and his entities, but rather his belief that investor assets were not used to fund the loans he and his entities received. However, as will be explained in the following section, that argument fails.

---

[5] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority.  See 11th Cir. R. 36-2."  United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

2.    COUNTS I, II, III, IV, V, AND VI – THE ANTIFRAUD

PROVISIONS OF THE SECURITIES ACT AND THE EXCHANGE ACT

The SEC seeks summary judgment as to William's liability for violations of the

Antifraud Provisions (Counts I – VI) and violations of Sections 206 and 209(d) of the

Advisers Act (Counts VII-XIV). (Dkt. 200) In his cross-motion, Williams argues that

he is entitled to summary judgment on each count because the SEC cannot establish

any of the elements necessary for these violations. (Dkt. 202)

Williams' liability under Section 206 and 209(d) of the Advisers Act turns in

part on his liability under § 17(a)(1) and (3) of the Exchange Act. See Steadman v.

SEC, 603 F.2d 1126, 1134 (5th Cir. 1979) ("Steadman I") (noting that the language of

§ 206 of the Advisers Act is drawn from § 17(a)(1) and (3) of the Exchange Act).[6] Thus,

the Court will address the SEC's claims under Section 17(a) of the Securities

Act and Rule 10b-5 of the Exchange Act's implementing regulations before addressing

its claims under the Advisers Act.

a.    VIOLATIONS OF THE ANTIFRAUD PROVISIONS (COUNTS I
– VI)

Section 17(a) of the Securities Act prohibits the offer or sale of securities by use

of interstate commerce:

(1) to employ any device, scheme, or artifice to defraud;

(2) to obtain money or property using any untrue statement
of a material fact or any omission to state a material fact

---

[6] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir.1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued on or before September 30, 1981).

> necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(1)-(3).

Section 10(b) of the Exchange Act renders it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe. . . ." 15 U.S.C. § 78j(b). Pursuant to this grant of authority, the SEC issued 17 CFR § 240.10b-5 ("Rule 10b-5"), which prohibits, in connection with the purchase or sale of any security, the use of interstate commerce:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.

There is "considerable overlap among the subsections of the Rule and related provisions of the securities laws"—*i.e.*, they prohibit some of the same conduct. <u>Lorenzo v. S.E.C.</u>, 139 S. Ct. 1094, 1102, 203 L. Ed. 2d 484 (2019). <u>See</u> <u>SEC v. Spence & Green Chem. Co.</u>, 612 F.2d 896, 903 (5th Cir. 1980) ("[T]he proscriptions

of section 17(a) are substantially the same of those of section 10(b) and rule 10b-5.").[7] Thus, Section 17(a) and Rule 10b-5 should be analyzed as one.

However, there are a few notable distinctions between Section 17(a) and Rule 10b-5 that courts have recognized. For example, for claims under Section 17(a)(1) and Rule 10b-5, the SEC must establish a defendant acted with scienter. S.E.C. v. Merch. Cap., LLC, 483 F.3d 747, 766 (11th Cir. 2007). But for claims under Sections 17(a)(2) and (3), the SEC need only demonstrate negligence. Id. And unlike the other subsections, "Rule 10b-5(b) and Section 17(a)(2) specifically require misrepresentation." SEC v. Complete Bus. Sols. Grp., Inc., No. 20-cv-81205-RAR, 538 F. Supp. 3d 1309, 1329 (S.D. Fla. May 11, 2021). Notably, however, "Rule 10b-5(b)—but not § 17(a)(2)—requires that the defendant be the 'maker' of the misrepresentation or omission, meaning the defendant has 'ultimate authority over the statement, including its content and whether and how to communicate it.'" Id. (first quoting Janus Cap. Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142, (2011); and then citing United States SEC v. Big Apple Consulting USA, Inc., 783 F.3d 786, 797 (11th Cir. 2015) (holding that Section 17(a)(2) cannot be read to include the "maker" restriction present in Rule 10b—5(b)).

Courts typically analyze the first and third prongs of Section 17(a) and Rule 10b-5 together and refer to them as "scheme liability." See SEC v. Mueller, No. SA-21-CV-00785-XR, 2024 U.S. Dist. LEXIS 7012 at *21 (W.D. Tex. Jan. 11, 2024);

---

[7] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir.1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued on or before September 30, 1981).

United States SEC v. Herrera, No. 17-20301-CIV-LENARD/GOODMAN, 2018 U.S. Dist. LEXIS 244477 at *17 (S.D. Fla. Apr. 11, 2018) (addressing claims under Section 17(a)(1) and (3) and Rule 10b-5(a) and (c) together; SEC v. Wealth Strategy Partners, LC, No. 8:14—cv—02427—T—27TGW, 2015 U.S. Dist. LEXIS 73068 at *19 (M.D. Fla. June 5, 2015) (same). See SEC v. Rio Tinto PLC, 41 F.4th 47, 48 (2nd Cir. 2022) (analyzing claims for scheme liability under Section 17(a)(1) and (3) of the Securities Act and Rule 10b-5(a) and (c) of the Exchange Act together); see also Happy Tax Franchising LLC v. Hill, 2023 U.S. Dist. LEXIS 2711 at *30 (S.D. Fla. Jan. 5, 2023). As the court in Mueller recognized:

> Traditionally, scheme liability has 'hinge[d] on the performance of an inherently deceptive act that is distinct from an alleged misstatement.' SEC v. Farmer, No. 4:14-CV-2345, 2015 U.S. Dist. LEXIS 136702, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015)
>
> . . .
>
> **The Supreme Court recently clarified, however, that the knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1).** Lorenzo v. SEC, 139 S. Ct. at 1100-02 (holding that these provisions 'capture a wide range of conduct,' including the 'dissemination of false or misleading material'); see also Malouf v. SEC, 933 F.3d 1248, 1260 (10th Cir. 2019) (**finding that Lorenzo also controls Section 17(a)(3) because this provision 'is virtually identical to Rule10b-5(c), which Lorenzo did address'**). As the Second Circuit aptly summarized, 'misstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination.' Rio Tinto, 41 F.4th 47, 48 (2nd Cir. 2022) (emphasis in original).

Mueller, 2024 U.S. Dist. LEXIS 7012 at *22-23 (emphasis added).

Because Williams' knowing dissemination of misleading materials with an intent to deceive can form part of the scheme liability analysis, the Court deems it prudent to analyze each category of misstatements and omissions under Rule 10b-5(b) and under Section 17(a)(2) before reaching the SEC's claims for scheme liability under Rule 10b-5(a) and (c) and Sections 17(a)(1) and (3). See Mueller, 2024 U.S. Dist. LEXIS 7012 at *23.

### b. MATERIAL MISREPRESENTATIONS AND OMISSIONS IN VIOLATION OF SECTION 17(A)(2) AND RULE 10B-5(B) (COUNTS II, V)

To establish a violation of § 17(a)(2) (Count II), the SEC must demonstrate (1) a material misrepresentation or materially misleading omission (2) in the offer or sale of a security, (3) made with negligence. SEC v. Morgan Keegan & Co., 678 F.3d 1233, 1244 (11th Cir. 2012). To establish a violation of § 10(b) or Rule 10b-5 (Count V), the SEC must show (1) a material misrepresentation or materially misleading omission (2) in connection with the purchase or sale of a security, (3) made with scienter. Id. Both violations also require proof of an interstate commerce or mails element. More specifically, under the Exchange Act, the SEC must demonstrate that Williams used the mails, an instrumentality of interstate commerce, or the facility of a national securities exchange in connection with the violation. See 15 U.S.C. § 78j(b). Similarly, the Securities Act contains as an element a requirement that a defendant have employed the mails or an instrumentality of interstate commerce in connection with the violation. See 15 U.S.C. § 77q(a). The Parties dispute each element of both

statutes.

The Court begins with the first element under each statute, which concerns whether Williams made materially misleading statements or omissions. The SEC claims that there is no genuine dispute of material fact that Williams made material misrepresentations and omissions in the Offering Documents. (Dkt. 200 at 30-32) In opposition to the SEC's motion, Williams not only disputes the materiality of each category of statements and omissions but also whether the SEC's alleged misrepresentations and omissions exist in the first instance. (Dkt. 221 at 23-24) Similarly, in Williams' motion for summary judgment, he argues that he did not make any "oral" misrepresentations and omissions to investors. (Dkt. 202 at 15-17)

As an initial matter, the plain text of § 17(a)(2) and Rule 10b-5(b) do not differentiate between written or oral misrepresentations and omissions. See § 17(a)(2), Rule 10b-5(b). Williams also points to no authority stating that a misrepresentation or omission can only be made orally. (See Dkt. 202 at 15-17) As such, the Court proceeds by analyzing whether Williams made any material misrepresentations and omissions to investors, whether written or oral.

### (1)  WILLIAMS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

"The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'" SEC v. Merchant Capital, LLC, 483 F.3d 747, 766 (11th Cir. 2007) (first quoting SEC v. Carriba Air, 681 F.2d 1318, 1323 (11th Cir. 1982); and then

34

citing <u>TSC Indus. v. Northway</u>, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976)). "The role of the materiality inquiry is 'to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision.'" <u>SEC v. Radius Capital Corp.</u>, No. 2:11-cv-116-FtM-29DNF, 2013 U.S. Dist. LEXIS 10316 at *15 (M.D. Fla. Jan. 24, 2013) (citations omitted).

(a)   CATEGORY ONE: LENDACY'S FUNDING SOURCE

The SEC contends that Williams led prospective investors to believe Lendacy had a separate funding source that would finance the loan from Lendacy to the investor and, further, that he led prospective investors to believe that their entire capital would be invested in KFYield. (Dkt. 200 at 30) For support, the SEC points to the Lendacy brochure given to investors, which states: "[y]ou keep 100% of your capital working, generating dividends and interest with the opportunity for continued appreciation." (Dkt. 200-48 at 19)

The Court finds that this representation was false. The SEC first points to the deposition of Ms. Locke, who testified that investors were unaware that their own capital was being used to fund Lendacy. Ms. Locke stated as follows:

> So if you are an investor in Kinetic Funds, you were able to receive a credit line for up to 70 percent of your investment value, your current market value in the form of a revolving credit line from [Lendacy] services. I understood from Michael when I asked how does [an investor receiving credit line] work – from Michael Williams – that Kinetic had a private equity placement into [Lendacy] and had identified [Lendacy] as an investment opportunity that

35

would generate income and generate a return for Kinetic investors. The reality of what was happening was, that the investor capital would come into the fund, **Lendacy had no source of income on its own**, so the only way that you could fund a loan to the investors would be to transfer their investment capital over to the Lendacy entity and wire their investment out back to them in the form of a loan. It was not my understanding that any of the investors were aware that they were being lent their own capital back. **They were told that a hundred percent of their investment would remain invested in the KF Yield Fund generating income, assets protected using US listed options and that an unsecured credit line was administered to them by . . . Lendacy, but in actuality, it was their own investment being sent back out to them at – and being charged interest.**

(Dkt. 200-20 at 5:24-25; 6:3-24) (emphasis added).

The SEC further highlights Ms. Locke's deposition testimony, in which she describes the marketing materials investors received, which led them to believe that their entire capital would be invested in KFYield:

> **Q** Okay. And the bottom of - - not the bottom, the product section of this page here, page 2 of the brochure. The last sentence of the first paragraph of the product section it states that all products are listed under US exchanges.
>
> **A** Correct.
>
> **Q** And that was -- that was a statement made to all the investors?
>
> **A** Yes, absolutely. All of the products would be listed on the US Stock Exchange, it would have options insurance mechanism available; open options contracts, had to pay a dividend. So all products have a yield component here on page one, had to pay a dividend and maintain a certain level of trading volumes to meet liquidity requirements. **So it was very, very clear that that was how your capital -- all of your capital would be invested and it would all be a**

> **hundred percent invested and deployed, and the word insurance was often used.** And the marketing pitch behind that was, well, you insurance your car, you insurance your health, you insurance your house, why wouldn't you insurance your net worth in your portfolio? And Michael's experience as an options market maker on the trading floor allowed him to you know, to sell that -- to sell that insurance idea. But - - yes.

(Dkt. 200-20 at 56:24-25; 57:1-24)

The SEC also points to the deposition of Myrna Rivera, the Chief Executive Officer of Consultiva, who testified that her clients—who invested in Kinetic Funds—were not told that their money could be used to fund Lendacy loans. As Ms. Locke explained in her deposition, Consultiva was "the largest independent investment advisory firm" in Puerto Rico; thus, it was "crucial" for Kinetic Funds to receive Consultiva's endorsement, and when Kinetic Funds ultimately received the endorsement, Kinetic Funds was able to begin attracting clients to invest in the hedge fund. (Dkt. 200-20 at 71:15-20) Ms. Rivera testified that it was Consultiva's understanding that Lendacy had access to "independent capital" in order to fund the loans it would make to investors. (Dkt. 200-56 at 51:8-23) She further testified that none of Consultiva's clients were ever told that their investment would be used to fund Lendacy loans or used to loan funds personally to Michael Williams. (Id. at 52:3-18)

The SEC provides the names of investors who were not told that their investment would be used to fund Lendacy loans. For example, Ms. Rivera lists the following as clients of Consultiva who were never told how their investment would be deployed: (1) a Puerto Rican state insurance fund named "Corporacion Del

Fondo De Seguro Del Estado" ("CFSE"); (2) Administracion De Compensaciones Por Accidentes De Automoviles ("ACCA"); (3) FMB1, LLC; (4) EHERT, Inc.; (5) Pre-Need; (6) Puerto Rico Community Foundation; (7) Sacred Hearty University; and (8) SPMT, LLC. (Id. at 87-88)

The SEC next points to Ms. Locke's deposition, in which she testified that at least two investors were unaware that their investment in Kinetic Funds would be used to fund loans for Lendacy:

> **Q** Were either AEELA or Angelo Diaz told that their investment in Kinetic Funds would be used to fund loans for Lendacy?
>
> **A** AEELA, no. Angelo Diaz was aware that he would be eligible for a loan if he invested, but he was not aware of how we accomplished that operationally with -- he -- as he understood, a hundred percent of his assets would be invested, remain invested in the market generating income, working for him, and that he would get a separate line of credit available to him to draw on.
>
> So he was aware of Lendacy because he used Lendacy. He was not truly aware of how Lendacy worked. He didn't ask any of the questions that somebody like Ryan Corbett asked. And then [h]is wife, she didn't -- she made the investment because he made the investment.

(Id. at 76:23-25; 77:1-14)

Based on the foregoing, the Court finds that the SEC has provided evidence to establish that a misrepresentation concerning Lendacy's funding source was made to prospective investors.

In response, Williams argues that he did not make a misrepresentation because portfolio margining, and not investor capital, funded Lendacy. (Dkt. 200-15 at 200:11-

15; Dkt. 221-2 at ¶¶ 140-142, 209) Williams raises the same argument in his motion for summary judgment. (See Dkt. 202-1 at ¶¶ 15-18) In fact, the gravamen of Williams' challenge to the SEC's contention that he made material misrepresentations and omissions to investors is that none of the loans he and his entities received from Lendacy consisted of investor assets but were rather made with margin that Lendacy received from Kinetic Funds by way of IB, its brokerage account. (Dkt. 221-2 at ¶¶ 140-143)

Williams claims that Kinetic Funds employed this strategy, using portfolio margin that it received from IB, to increase its ability to pursue various investment strategies and to buy various investments and assets. (Id. at ¶ 109)

As explained above, Williams states that Kinetic Funds worked with Lendacy to offer Kinetic Funds' investors the ability to borrow up to 70% of the value of their investment in Kinetic Funds at substantially reduced interest rates to use however the investors might wish — e.g., to buy a home, to invest in a business, to pay a debt, etc. (Id. at ¶ 136) Williams claims that Kinetic Funds was able to offer this service to its investors by using portfolio margin in its IB account which it would lend to Lendacy, which funds Lendacy would then lend to the investors. (Id. at ¶ 138-39) Said differently, according to Williams, all of the funds transferred from Kinetic Funds' bank account to Lendacy's bank account were funds that were IB's funds (i.e., margin and not investor funds), which IB had loaned to Kinetic Funds. (Id. at ¶ 140) Thus, according to Williams, Lendacy was lending only IB's funds (or margin), and not investor assets, to the investors to whom it extended loans. (Id.) By extension, Lendacy

39

was lending only IB's funds (or margin), and not investor assets, when it provided loans to Williams and his entities. (Id. at ¶ 143)

Initially, the Court notes that the SEC has pointed to evidence that investor assets, and not margin, were used to fund the loans given to Lendacy. In Declaration Two, Ms. Ivory explains that upon reviewing the bank account statements of Kinetic Funds and Lendacy, she determined that the accounts received a combined total of $312,275.00 from IB between January 2015 and September 2019, with the last deposit from IB occurring on October 26, 2016. (Dkt. 219-2 at ¶ 7) But, according to Ms. Ivory, the Lendacy bank account statements show that "approximately 44 Lendacy credit line draw payments totaling over $1.5 million were paid between November 2016 and September 2019." (Id. at ¶ 9) Williams, for his part, concedes that he and his entities received loans from Lendacy totaling over $6.3 million between March 2017 and April 2019. (See Dkt. 221-2 at ¶¶ 181, 186, 191, 193, 201). In other words, the $312,275.00 that Kinetic Funds and Lendacy received from IB could not have funded the approximate $7.8 million in Lendacy loans given to investors, Williams, and his entities.

However, even if the Court credited Williams' version of how investors received loans from Lendacy, which the Court has done because Williams is the non-moving party in regard to the SEC's motion for summary judgment, there is no dispute that investor assets were not used in the way represented. "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine*

40

issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis added).

Williams testified that brokerage firms provide portfolio margining to a customer based on the total percentage of the *customer's assets* in his or her account, which the customer can borrow from the brokerage firm. (Dkt. 221-2 at ¶¶ 101-105) (emphasis added) Consequently, IB's ability to provide cash to Lendacy, which in turn provided loans to Williams and his entities, depended on the existence of investor capital in the first instance. At the March 6, 2020, asset freeze hearing, Judge Jung noted the same when counsel for Defendants argued that margin was being used instead of investor assets to fund the Lendacy loans:

> MR. KEHOE: They weren't in fact using the assets. They were using the margin.
>
> THE COURT: Well, no. **Of course they were using the assets**. **You get the margin by collateralizing grandma's stock**.
>
> MR. KEHOE: Sure.

(Dkt. 227-2 at 4) (emphasis added).

More to the point, Williams fails to proffer his own evidence (by affidavits, depositions, answers to interrogatories, or admissions on file) that all investors were informed that portfolio margining was being used to fund Lendacy and thereby provide loans to investors, to Williams, and Williams' entities. In short, not only was a misrepresentation made, but there was also an omission of fact necessary to render the Lendacy brochure and Operating Agreement not misleading to investors.

Further, this misrepresentation and/or omission concerning the use of investor assets or margin to fund loans was certainly material. Williams admits that "[m]argin is a debt that carries interest." (Stipulation of Agreed Material Facts, Dkt. 220 at ¶ 21) Williams also admits that "[i]f the Brokerage Account fell below the minimum maintenance margin, then IB, at its sole discretion, could issue a margin call, i.e., require Kinetic Funds to put more cash into the Brokerage Account, purchase more options, or liquidate some of its positions." (Id. at ¶ 22)

Although Williams argues that a margin call never happened, (Dkt. 221-2 at ¶ 212), the Court cannot agree that because a margin call never occurred, a reasonable investor would conclude that his or her investment in Kinetic Funds had been used in a way that was truthfully represented. To the contrary, courts have found that this type of misrepresentation and omission is material to the reasonable investor. See SEC v. Smart, 678 F.3d 850, 857 (10th Cir. 2012) (finding that "it would be material to a reasonable investor that his or her money was not being used as represented in safe investment strategies, but rather, in high risk ventures and for the payment of personal expenses."); see also SEC v. Reynolds, No. 1:06-cv-1801-RWS, 2010 U.S. Dist. LEXIS 106822 at *10 (N.D. Ga. Oct. 5, 2010) (finding that a material misrepresentation occurred where defendant falsely stated to investors that their funds would remain in defendant's bank account until the transaction was approved). The possibility that investors could lose all of their investment as a result of a margin call is material, whether or not a margin call ever occurs.

Consequently, the Court finds that a material misrepresentation concerning the

source of Lendacy's funding was made to investors, whether Williams used investor assets or margin to fund such loans given to himself and his entities.

### (b)   CATEGORY TWO: WILLIAMS' OWNERSHIP OF LENDACY

The SEC claims Williams failed to disclose to most investors that KFYield would invest in a "private sector funding company," and to the extent he did, he omitted that the "private sector funding company" referred to his private entity, Lendacy. (Dkt. 200 at 23) The Court agrees. The undisputed facts are as follows. Exhibit C-1 to the Operating Agreement, signed by Class C Members, provides that "[a]ll funds may include a 'Preferred Return' investment. This investment is in a private sector funding company that offers fixed[-]rate preferred interest returns." (Dkt. 200-6 at 11) Exhibit B-1 to the Operating Agreement, signed by Class B Members, omits the Preferred Return provision entirely. (Id. at 6) Both agreements bear the signature block of "Kinetic Funds I, LLC Class A Member: **Michael S. Williams**, Managing Member of KF42, LLC, Managing Member of its Managing Member, Kinetic Partners, LLC." (Dkt. 200-6 at 9, 14) (emphasis added) The Agreements do not identify the private sector company as Lendacy, nor does it disclose that Lendacy is Williams' entity. (See Dkt. 200-6)

Williams fails to proffer his own specific facts (by affidavits, depositions, answers to interrogatories, or admissions on file) to oppose the SEC's specific facts on this ground. The SEC shows that there is an absence of evidence to support Williams' contention that he disclosed this information to investors. In his deposition, Williams

concedes that Exhibit C-1 fails to identify for investors what the "private sector funding company" is or that the company refers to his private entity, Lendacy. (Dkt. 200-15 at 144-45) Williams admits that the "preferred return investment," referenced in Exhibit C-1 to the Operating Agreement, refers only to his entity, Lendacy, of which he is the majority owner. (Id. at 145:13-24) Williams further states that he thought it was not important for investors to know that he was the majority owner of Lendacy. (Id. at 146:20-25, 147:1-2)

Because Williams failed to disclose Lendacy as the "private sector funding company," the Court finds that the SEC has established an omission. To the extent Williams may have personally disclosed to "several" investors that Lendacy was the "private sector funding company" referred to in the Operating Agreement, (Dkt. 221-2 at ¶ 210), there is no dispute that he failed to disclose to any investors that he was the majority owner of it. (Dkt. 200-15 at 146:20-25, 147:1-2) As such, the SEC has established an omission on this ground as well.

Furthermore, the Court finds that there is no genuine dispute of material fact as to whether either omission was material. Williams testified that he believed it was not important for investors to know that he was the majority owner of Lendacy because "the investors [were] generating income from [Lendacy], using [Lendacy] to provide themselves loans." (Id. at 146:17-19) Williams also points to his Declaration, filed in support of his response to the SEC's motion for summary judgment, in which he states that "[a]s a service and benefit to Kinetic Funds' investors, Kinetic Funds worked with Lendacy to offer Kinetic Funds' investors the ability to borrow up to 70% of the value

44

of their investment in Kinetic Funds at substantially reduced interest rates to use however the investors might wish — *e.g.*, to buy a home, to invest in a business, to pay a debt, etc." (Dkt. 221-2 at ¶ 136)

However, as explained above, investors were never aware that the **source** of Lendacy's funding was their own money or that it was their own money being returned to them in the form of a loan from Lendacy whenever they invested in Kinetic Funds. Investors were also never aware that it was their own money that funded the loans Williams received from Lendacy for his personal and business ventures. These omissions were material because there was a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the 'total mix of information available.'" Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988); see SEC v. Smart, 678 F.3d at 857. As such, the Court finds that Williams' failure to disclose that Lendacy was the private sector funding company referenced in the Operating Agreement and that he was the majority owner of Lendacy were material omissions as a matter of law.

### (c)    CATEGORY THREE: INCOME-PRODUCING U.S. LISTED PRODUCTS

Williams admits that he told investors that their capital would be invested in income-producing U.S.-listed financial products. (Joint Stipulation of Agreed Material Facts, Dkt. 220 at ¶ 10) However, contrary to those representations, the SEC claims Williams "invested" a substantial portion of investor capital in Lendacy. While Williams disputes that he invested a "substantial portion" of investor capital in

45

Lendacy, he nevertheless concedes that Lendacy is not a U.S.-listed financial product. (Id. at ¶ 12) The Court finds that there is no genuine dispute of material fact that Williams made this misrepresentation to investors and that this misrepresentation was material.

As above, the SEC highlights the deposition of Kelly Locke, who testified that "Lendacy had no source of income of its own" and that it was the investors' "own investment being sent back out to them – and being charged interest." (Dkt. 200-20 at 6:11, 23-24). Ms. Locke further testified that a majority of investors' money was not given to Kinetic Funds' brokerage account at IB. (Id. at 12:3-5) Instead, according to Ms. Locke, investor money:

> …stayed sitting in the bank account. It would be used for -- it was used for certain transactions from Michael. The two particular real estate transactions. It would be used sometimes for operational expenses if the companies cannot afford to pay the bill, which Lendacy was never profitable on its own, El-Morro was never profitable on its own, so these companies continually had to be subsidized all by the one source of income that we had, which was investor capital into the KF Yield Fund.
>
> Q: And the investor capital was also used to fund Lendacy loans, correct?
>
> A: Yes.

(Id. at 12:6-19).

The SEC also points to Ms. Ivory's Declaration One. (Dkt. 200-24) There, she explains that the bank statements of Kinetic Funds and Lendacy revealed that at least $9.1 million (net) of investor funds was transferred from Kinetic Funds' bank account

46

to Lendacy's bank account between January 2015 to September 2019. (Id. at ¶ 11) An additional $31,000.00 in payments was made from the Kinetic Funds bank account to Silexx, which as stated above, was a company that Williams partially owned and/or one in which he held a financial. (Id. at ¶ 12) One payment in the amount of $37,000.00 was made to Williams' mother, Margery J. King, in May 2015 from the Lendacy bank account. (Id. at ¶ 13) As noted above, Williams concedes that he received loans from Lendacy for the benefit of himself and his entities. (See Dkt. 221-2 at ¶¶ 169-210)

As a result, the Court finds that, based on the deposition of Ms. Locke, the Declarations of Ms. Ivory, and Williams' concession, the SEC provides evidence that investor capital was diverted to Lendacy, which does not comport with Williams' representation to investors that their capital would only be invested in income-producing U.S. listed financial products. As noted above, Williams even concedes that Lendacy is *not* a U.S.-listed financial product. (Dkt. 200 at ¶ 12; Dkt. 221 at 10, n. 55-56)

Nonetheless, Williams argues that the Court should ignore Ms. Locke's testimony because she only stated that a "majority" (and not all) of investor funds were used to fund Lendacy loans. (Dkt. 221-1 at 29) Williams' argument misses the mark. Williams appears to suggest that because *some* of the investor funds were not used to fund Lendacy loans, those funds were thus invested in income-producing U.S. listed financial products and, consequently, he did not make a misrepresentation to investors. But the bank accounts, as noted above, belie that assertion because at least some of the funds that were not transferred to Lendacy and remained in the Kinetic

47

Funds bank account were instead transferred to Williams' entity, Silexx. (Dkt. 200-24 at ¶¶ 12-13)

More importantly, Williams unequivocally concedes that he "told investors that their money would be invested in income-producing U.S. listed financial products." (Dkt. 220 at ¶ 10) Williams never told investors that their capital would be transferred to Lendacy or to any other person or entity that was not a U.S.-listed financial product. (See id.) As such, Ms. Locke's testimony – that only a "majority" of KFYield's investor funds were used to fund Lendacy loans – still demonstrates that Williams acted in a manner that was contrary to the representation made to investors because each investor's capital should have only been invested in income-producing U.S.-listed financial products.

Williams next *argues* that he invested all investor funds in U.S.-listed financial products. For support, he relies solely on his Declaration, which does not address the SEC's contention of misrepresentation. In his Declaration, Williams states that "[f]or each investor who invested in Kinetic Funds, an amount of U.S.-listed financial products was purchased in Kinetic Funds' IB account equal in value to the investor's investment in Kinetic Funds." (Dkt. 221-2 at ¶ 134; see also id. at ¶¶ 139, 151) Even if Williams is correct, Williams fails to explain how the investor's investment *remained* invested in U.S.-listed financial products when investors' capital was either transferred to Lendacy or given to Lendacy from Kinetic Funds through IB (*i.e.* margin) to fund the loans Williams and his entities received. As explained above, Williams' argument that investor capital was not being used to fund the Lendacy loans, but that it was

48

rather portfolio margining being employed by IB to fund the loans, does not advance his claim that he was using investor money in the way that he represented he would to investors.

For the foregoing reasons, the Court also finds that this misrepresentation was material. Investors' money was not being used in the way that was represented to them, and, on these facts, that is material as a matter of law. See Smart, 678 F.3d at 857.

### (d)   CATEGORY FOUR: SECURE PRINCIPAL

Next, Williams concedes that he advised investors that KFYield was a conservative blended fund and their principal would be secure because the KFYield portfolio would be hedged with listed options. (Dkt. 220 at ¶ 13) Williams further concedes that written marketing materials state that Kinetic Funds will "maintain 90% principle [sic] protection" and that "90% [of KFYield's] portfolio [is] hedged using listed options against market volatility risk." (Id. at ¶ 14)

However, the SEC claims that Williams failed to hedge at least 90% of KFYield's portfolio using listed options. The SEC relies on Ms. Ivory's Declaration One, where she notes that investor assets totaled approximately $39 million as of January 2019. (Dkt. 200-24 at ¶ 10) Investor assets diverted to Lendacy (which totaled approximately $9.1 million) accounted for more than 23% of KFYield's proceeds between January 2015 and September 2019. (Id. at ¶¶ 8, 11) The SEC also points to a summary of misappropriated funds as proof that Kinetic Funds transferred money to Lendacy, which in turn led to loans received by Williams and Williams' entities

totaling approximately $6.3 million. (Dkt. 200-55) Thus, because more than 23% of KFYield's proceeds were diverted to Lendacy, the SEC contends that 90% of KFYield's portfolio could not have been hedged using listed options.

Williams points to his own Declaration in an attempt to dispute these facts. There he states that "[e]very investment that Kinetic Funds held in its IB account was hedged with U.S.-listed options so that they could never lose more than 10% of their value due to adverse market movement." (Dkt. 221-2 at ¶ 131; see also id. at ¶¶ 132-133, 135) Williams further claims that "because the collateral supporting the funds that Lendacy loaned to its customers were U.S.-listed financial products held in Kinetic Funds' IB account that were hedged with U.S.-listed options, Lendacy's loans were effectively hedged with U.S.-listed options." (Dkt. 221-2 at ¶ 152) Similarly, in his deposition, when asked whether Lendacy could be hedged using listed options, Williams answered in the affirmative and stated:

> Well, you can do indirect hedging, correlating hedging and various arbitrage hedging. So one of the things that I have done in the past frequently was using options to hedge various portfolios of securities, housing, illiquid assets, even corporate bonds. So options can be used to hedge illiquid assets as well as liquid assets. Obviously we over-hedged the positions in case there were any security risks or any losses in Lendacy.

(Dkt. 200-15 at 158:10-19)

Williams' response, however, does not controvert the SEC's claim that Williams failed to hedge at least 90% of the KFYield portfolio using listed options. As explained above, more than 23% of KFYield's proceeds were diverted to Lendacy,

which Williams cannot credibly dispute. Hedging the collateral that supported the diverted funds, which Williams claims he did, is not equivalent to hedging investor funds and not diverting them. At best, Williams hedged 67% of investor funds, not 90% of the funds as he promised. Thus, the Court finds that this misrepresentation was material because investors' money was not being used in the way that was represented to them. See Smart, 678 F.3d at 857.

### (e)   CATEGORY FIVE: LIQUIDITY

The SEC argues that Williams made it clear to investors that KFYield assets had liquidity. (Dkt. 200 at 18)  For example, the SEC points to an email sent by Williams to Consultiva, in which he attaches a report stating that KFYield offers "Liquidity (quarterly liquidation with 30-day notice on any unencumbered funds)." (Dkt. 200-18 at 7) The report further stated that "[l]iquidity and volume of products are in the top 20% of all listed securities. Analysis of these listed products reflect[s] a very high liquidity factor and improves the ability to mitigate risk and/or liquidate positions in a timely fashion." (Id. at 8) Williams does not dispute these facts, and he even concedes that written brochures claimed: "Your money is always available . . . . The fund's positions are hedged out to 90 days, so with a 30-day written notice prior to the quarter end, the fund can redeem 100% principal without penalties." (Dkt. 220 at ¶ 15) (citing Dkt. 200-19 at 4)

The SEC claims, however, that KFYield's investment in Lendacy, which consisted of unsecured loans primarily for the benefit of Williams, significantly limited Kinetic Funds' ability to honor redemption requests to all investors equitably. (Dkt.

51

200 at ¶ 29) As proof, the SEC points to four Lendacy Credit Facility and Disclosure Agreements, *i.e.* loan agreements, in which Williams and his entities received loans from Lendacy. Two of the loan agreements, totaling $2,550,000.00 are unsecured, (Dkts. 200-36, 200-37), while the other two agreements, totaling $4,272,000.00 were also unsecured. (Dkts. 200-53, 200-54)

Williams, for his part, claims that all of the loan agreements he and his entities entered into with Lendacy were secured. (See Dkt. 221-2 at ¶¶ 179-80, 190, 195, 197)

For example, regarding the $1,517,000.00 loan Williams received from Lendacy to purchase his residential properties in Puerto Rico, Williams testified that "[a]s collateral . . ., I pledged to Lendacy a security interest in my 40% interest in Silexx, which I was then in the process of selling to the Chicago Board of Options Exchange ('CBOE'). In the course of my negotiations with the CBOE, the parties agreed that the value of Silexx was $20,000,000, which meant that my 40% interest in Silex was worth $8,000,000 — which was well more than the $1,517,000 line of credit I sought from Lendacy." (See id. at ¶ 179) Williams provides the Collateral Agreement for support. (Dkt. 221-2 at 179-181) Williams also claims that he pledged to Lendacy $2,550,000.00 of the payments he "was to receive from the sale of Silexx" for the Lendacy loans he received on behalf of his entity, LF42. (See id. at ¶¶ 194-97)

However, being in the process of selling a 40% interest in another company, an asset that Williams contends was valued at $8,000,000.00, is not the same as leaving investor funds in an account available to liquidate on 30 days' notice. If Silexx was truly "liquidity equivalent," as Williams appears to contend, Williams should have

52

liquidated his Silexx asset instead of borrowing cash from Lendacy to purchase his residential properties. There is no genuine dispute that an unsold asset pledged as collateral is not equivalent to Williams' representation that liquid cash would be available for an investor on 30 days' notice.

Williams also claims that he "gave Lendacy a copy of the title documents and other paperwork related to the residential property . . . and agreed to assign full title to the residential property to Lendacy in the event [he] failed to repay" the Lendacy loan. (Dkt. 221-2 at ¶ 180) However, he asserts that he "do[es] not know what Lendacy did with the title documents and other paperwork that I gave it." (Id.) "It is the universal rule with reference to pledges of personal property as security for debt that possession, either actual or symbolic, of the thing pledged must be delivered by the pledgor to the pledgee, in order to create the lien." Nat'l City Bank v. Toffel (In re Ala. Land & Mineral Corp.), 292 F.3 1319, 1326 (11th Cir. 2002). The Court takes as true Williams' testimony, as the non-moving party on the SEC's motion for summary judgment, that a lien was created on the residential property for the benefit of Lendacy because he pledged title of the property to it. But even taking as true such testimony, "a lien . . . is no guarantee that property will have the imputed value at the time it may become necessary to exercise the lien." Bank Leumi Trust Co. v. Meagher, No. 93 Civ. 7351, 1994 U.S. Dist. LEXIS 11711 at * 11 n.5 (S.D.N.Y. Aug. 22, 1994). Further, as above, pledging title to a residential property is not the same as leaving investor funds in an account available to liquidate on 30 days' notice. Williams also fails to explain whether such a lien could be easily liquidated in the event an investor

requested his or her money on 30 days' notice. The Court finds that there is no genuine dispute that a lien on a residential property pledged as collateral is not equivalent to Williams' representation that liquid cash would be available for an investor on 30 days' notice.

Williams similarly contends that his entity, Scipio, pledged to Lendacy title to the historic bank building that it bought for $2,755,000.00, which was money that Scipio received from Lendacy as a loan. (See Dkt. 221-2 at ¶¶ 190-91) For the same reasons explained above, however, the Court finds that there is no genuine dispute that a lien on a historic bank building pledged as collateral is equivalent to Williams' representation that liquid cash would be available for an investor on 30 days' notice.

In light of the foregoing, the Court concludes that there is no genuine dispute of fact concerning whether Williams obtained unsecured loans from Lendacy. As a result, KFYield's investment in Lendacy, which consisted of unsecured loans made to Williams and his entities, significantly limited KFYield's ability to honor redemption requests to all investors equitably. (Dkt. 200 at ¶ 29)

Williams, however, directly disputes the SEC's contention that Kinetic Funds' ability to honor redemption requests was ever limited. In his declaration, Williams states:

> 151. Since all of the funds that Kinetic Funds' investors invested in Kinetic Funds were invested in U.S.-listed financial products — and all of those investments were hedged and none of the[m] could ever lose more 10% of their value (and therefore none of them would ever be worth less than 90% of the price Kinetic Funds paid to purchase them) — and since Kinetic Funds generally limited the

54

amount that its investors could borrow from Lendacy to 70% of the value of their investments in Kinetic Funds, **there was never any danger that the funds loaned by Kinetic Funds to Lendacy would jeopardize any of the investors' investments in Kinetic Funds.**

152. Further, because the collateral supporting the funds that Lendacy loaned to its customers were U.S.-listed financial products held in Kinetic Funds' IB account that were hedged with U.S.-listed options, Lendacy's loans were effectively hedged with U.S.-listed options.

153. If an investor invested $1,000,000 in Kinetic Funds, those funds were invested in U.S-listed financial products that were hedged and the values of which could never fall below $900,000. If Kinetic Funds then lent $700,000 to Lendacy to lend to that same investor, **there would always be sufficient funds available to cover that loan (with a $200,000 cushion) — even if the investor skipped town and failed to repay any part of the loan and even if the stock market crashed and the value of U.S.-listed financial products fell to $0.50/share.**

154. Since every loan made by Kinetic Funds to Lendacy to an investor was coordinated with any investment by the investor in Kinetic Funds and generally capped at a maximum of 70% of the investor's investment in Kinetic Funds, even if every one of Kinetic Funds' investors borrowed 70% of the value of each of their respective investments in Kinetic Funds and then they all skipped town and refused to repay their Lendacy loan and then the stock market collapsed, **Kinetic Funds would still have sufficient assets to repay all of its investors their investments in the event Kinetic Funds was liquidated.**

(Dkt. 221-2 at ¶¶ 151, 153-154) (emphasis added).

Williams' explanation, however, fails to controvert the SEC's evidence that he obtained unsecured loans from Lendacy and that, by doing so, he affected Kinetic Funds' ability to equitably honor redemption requests to all investors. See supra. There

is no genuine dispute that using investor cash to obtain unsecured loans affects the ability of a hedge fund to equitably honor redemption requests on 30 days' notice as promised to investors. The Court further finds that this misrepresentation was material because investors' money was not being used in the way that was represented to them. See Smart, 678 F.3d at 857.

### (f)    CATEGORY SIX: ACCOUNT STATEMENTS

The SEC claims that Williams misrepresented to investors the amount of assets in Kinetic Funds because the known assets were less than the aggregate amount reflected on investor account statements.

As evidence, the SEC first points to Ms. Ivory's Declaration One. There, she states that upon reviewing the known assets of Kinetic Funds (Kinetic Funds' bank account, total number of outstanding loans Kinetic Funds extended to Lendacy, and Kinetic Funds' IB account statements), she was able to compute assets totaling approximately $28.7 million as of October 2019 for Kinetic Funds. (Dkt. 200-24 at ¶¶ 5-9) However, investor proceeds, as evidenced by Kinetic Funds' monthly transactions spreadsheet, (id. at 8-13), totaled approximately $39 million between January 2013 and June 2019. Similarly, the Investor Statements, (Dkt. 200-25 at 30-40; Dkt. 200-26 at 1-26), showed a total market value of approximately $39 million as of January 2019 for Kinetic Funds, of which about 98% was held in the KFYield fund. Thus, the SEC provides evidence demonstrating that Kinetic Funds' known assets ($28.7 million) were less than the aggregate amount reflected on investor account statements ($39

million).

For corroboration, the SEC points to the deposition of Ms. Locke, who testified that the account statements investors received did not reflect any Lendacy loans that may have been given to them. Specifically, the SEC's questioning, and Ms. Locke's response, went as follows:

> Q. Okay. If a particular investor in the KF Yield Fund also utilizes the credit line from Lendacy or KCL, would that be reflected in their KF Yield statement?
>
> A. No. They had a separate credit line statement that reflected their loan obligation with KCL Services. So it's not indicated anywhere on the Kinetic statements that there was a loan obligation or a credit line. They were two entirely different statements.
>
> Q **Would the market value of their holdings in the KF Yield Fund be different if they had participated in the credit line?** If you understand what I'm saying.
>
> A Yes. And the -- a yes to I understand what you're saying, but **no to your question. Their market value was calculated based on a hundred percent of the investment amount**. So it's not -- if you are alluding to maybe only you know, maybe their investment statement only represented 30 percent because that's all that was left in there and they used the other amount as a loan, that's not the case. **Their investment statement represented their full investment amount regardless of the lending of the loan and calculated their market value on their total investment even though a significant portion -- all of -- you know, even though that money would have to be transferred over to fund their loan if they had one, the statement always represented a hundred percent of their investment amount.**

(Dkt. 200-20 at 13-14) (emphasis added) Thus, Ms. Locke's testimony provides independent, corroborating evidence that the aggregate amount reflected on investor statements did not account for any money that was transferred over to Lendacy to provide loans to investors or to provide loans for Williams or his entities.

Williams concedes that he had ultimate control over the contents of the account statements. (Stipulation of Agreed Material Facts, Dkt. 220 at ¶ 16) However, in his Declaration, he contends that "[e]ach month, Kinetic Funds prepared an account statement for each of Kinetic Funds' investors ("Kinetic Funds Statement"), which account statement accurately reflected the current total value of each investor's respective investment in Kinetic Funds based on the current total value of all of the assets owned by Kinetic Funds — including the total value of all of the U.S.-listed financial products Kinetic Funds held in its IB account, the total value of the margin debt it owed to IB, the total value of the funds it held in its BMO account, and the total value of the loans it extended to Lendacy and deducting the Class A Member's share of Kinetic Funds' net profits and the expenses incurred by Kinetic Funds." (Dkt. 221-2 at ¶ 166)

Williams further testifies that "[t]he total value of all of the Kinetic Funds' investors' investments in Kinetic Funds as reflected in the Kinetic Funds Statements was always equal to the total value of all of the assets owned by Kinetic Funds as reflected in the Bloomberg Report on that same date because the Kinetic Funds Statements and the Bloomberg Report took into account all of the Kinetic Funds' holdings at IB and outside of IB." (Id. at ¶ 167) Williams claims that "[t]o the extent

58

that the Kinetic Funds Statements and the Bloomberg Reports were generated on different days — even if just one day apart — the total value of the Kinetic Funds' investors' investments in Kinetic Funds as reflected in the Kinetic Funds Statements would not be equal to the total value of all assets owned by Kinetic Funds as reflected in the Bloomberg Reports due to market changes, investment transactions, etc., in the intervening time." (Id. at n. 12)

While the Court believes it is a close call, the Court finds that Williams has raised a genuine dispute of fact concerning the accuracy of the account statements. It is not for this Court to weigh the evidence and decide the truthfulness of Williams' sworn-to statement that, on a given day, Kinetic Funds' investor statements may be different from the Kinetic Funds' assets as reflected in the Bloomberg reports given the "market changes [and] investment transactions" that may occur. (See id.) As a result, the Court cannot address whether this purported misrepresentation was material.

### (g)   CATEGORY SEVEN: PORTFOLIO PERFORMANCE

The SEC next asserts that KFYield's portfolio performance to investors did not match its actual performance. (Dkt. 200 at 12) The SEC points to Defendants' Bloomberg reports as proof that a misrepresentation was made to investors. The SEC states, and Williams concedes, that "the Bloomberg report as of December 29, 2017, the contents of which Williams had ultimate authority over, reflected that Kinetic Funds' total assets were $31.78 million and its year-to-date performance was 1.04%." (Stipulation of Agreed Material Facts, Dkt. 220 at ¶ 17) (citing Dkt. 200-57 at 10-11)

However, the SEC claims that the Bloomberg report failed to include the margin balance contained in KFYield's brokerage statements from IB. (Dkt. 200 at ¶ 31) (citing Dkt. 200-57 at 10-11) The SEC explains that KFYield's annual IB statement as of December 31, 2017, actually showed that KFYield had a net asset value of approximately $4.7 million, which was a -27.52% time-weighted, or annual, rate of return from December 31, 2016 ($88,877,936.84) in cash, *i.e.,* margin. (Dkt. 200 at ¶ 32; Dkt. 200-58) In other words, the IB statement reflected a negative dollar amount of approximately $89 million on margin for KFYield, demonstrating that the overall annual performance of the KFYield portfolio resulted in a loss. Further, the annual statement showed that KFYield had incurred $439,632.20 in interest and that KFYield incurred market-to-market losses of $3,154,506.38. (Dkt. 200 at ¶ 32; Dkt. 200-58) According to the SEC, none of this information was reflected in the Bloomberg report, making it appear to investors as if KFYield was performing better than it was.

Williams points to his Declaration in an attempt to raise a genuine dispute of fact as to whether the Bloomberg reports failed to include the margin balance. There, he asserts that Kinetic Funds used Bloomberg to generate a report that "accurately reflected the current total value of all of the assets owned by Kinetic Funds (including those assets allocated to KFYield) and the performance of those assets — including the total value of all of the U.S.-listed financial products Kinetic Funds held in its IB account, **the total value of the margin debt it owed to IB**, the total value of the funds it held in its BMO account, and the total value of the loans it extended to Lendacy." (Dkt. 221-2 at ¶ 165) (emphasis added)

Williams' testimony, however, does not create a dispute of material fact. "It is well-settled that conclusory affidavits, submitted by a nonmoving party in opposition to a motion for summary judgment, will not create an issue of fact for trial." Org. of Pro. Aviculturists Inc. v. Kershner, 564 F. Supp. 3d 1238, 1247 (S.D. Fla. 2021) (citing United States v. Stein, 881 F.3d 853 (11th Cir. 2018)). "Conclusory allegations without specific supporting facts have no probative value." Id. (citing Roda v. Univ. of Miami, 542 F. Supp. 3d 1289, 1294-95 (S.D. Fla. 2021)). Further, affidavits that are based upon "[b]ald conclusions, opinions, and hearsay without supporting specific facts are not admissible and do not create a genuine issue of material fact." Venerio v. Fed. Express Corp., No. 17-22624, 2018 U.S. Dist. LEXIS 159154, 2018 WL 5283876, *5 (S.D. Fla. Sept. 17, 2018) (citing Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985)).

Here, Williams' statement that Kinetic Funds used Bloomberg to generate a report that included "the total value of the margin debt it owed to IB," is simply a conclusory allegation. Williams has set forth no "specific supporting facts" in support of his contention that the Bloomberg reports included KFYield's margin balance. For instance, he does not provide a Bloomberg report for the Court to review despite his concession that he "had ultimate authority" over the contents of such a report. (See Dkt. 220 at ¶ 17) Instead, Williams has simply proffered a "[b]ald conclusion . . . without supporting specific facts," which is "not admissible and do[es] not create a genuine issue of material fact." See Evers, 770 F.2d at 986.

The Court further finds that this omission of the margin balance on the

Bloomberg report was material because there was a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the 'total mix of information available.'" <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 232 (1988). A reasonable investor would conclude that Williams' failure to disclose the actual performance of KFYield was material because the dramatic difference between KFYield's year-to-date performance (+1.04%) and its negative annual weight of return (-27.52%) would affect his or her decision to invest or continue investing in KFYield.

### (h)   CATEGORY EIGHT: MARGIN

The SEC claims that Williams failed to disclose to investors what portion of Kinetic Funds' portfolio was margined. (Dkt. 200 at 19) For support, the SEC cites to Williams' deposition, in which he admitted that investors' account statements omitted the portion of KFYield's holdings that were bought on margin. (Dkt. 200-15 at 274:6-24) Thus, there is no dispute that investors' account statements failed to explain what portion of KFYield's holdings were bought on margin.

But Williams also testified that "margin" is referenced in investors' "operating agreements, their documents, the exhibits, and some of the marketing materials." (<u>Id.</u> at 274:15-19) The Operating Agreements provide as follows: "The Funds' goal is not to exceed a Risk Margin of 75% to equity ratio, measured in the form of 'haircut' or risk-based margin. **While it is the goal to maintain this Risk Margin exposure, a particular position or positions may increase or decrease depending on market conditions**. IT MUST BE NOTED that this is a guideline only when deploying

positions and maintaining the positions, and that **this goal may be exceeded, in the sole and absolute discretion of the Class A Member from time to time and at any time.**" (Dkt. 200-6 at 7, 12) (emphasis added) Williams also claims, in his Declaration, that "every member of Kinetic Funds was entitled to obtain from Kinetic Funds at any time full information regarding Kinetic Funds' activities, affairs, and financial information – including, but not limited to, the amount of Kinetic Funds' investments that were margined" upon request. (Dkt. 221-2 at ¶ 89)

Based on the foregoing, it would appear that investors were aware that the KFYield portfolio was margined and that, while the Fund had a goal not to exceed a risk margin of 75% to equity ratio, that percentage may be exceeded by Williams, as the Class A Member of Kinetic Funds, "at any time." (See Dkt. 200-6 at 7, 12) At a minimum, therefore, a dispute of fact exists as to whether Williams was required to disclose the precise portion of the KFYield portfolio that was on margin as the language of the Agreement provides that the percentage of the portfolio that was margined could fluctuate.

But even if Williams had a duty to disclose the portion of the KFYield portfolio that was margined, it is unclear whether that information would be material to a reasonable investor. Based on the Operating Agreement, investors knew that the Fund could be margined at 75%, less than 75%, or greater than 75%. (See Dkt. 200-6 at 7, 12) Thus, it is unlikely that reasonable investors in this situation "would attach importance to the fact . . . omitted in determining [their] course of action" because it would not alter the "total mix" of information considered by them when they decided

to invest in Kinetic Funds. See Merchant Capital, LLC, 483 F.3d at 766; Radius Capital Corp., 2013 U.S. Dist. LEXIS 10316 at *15. As a result, the Court finds that a dispute of fact remains as it relates to this alleged omission and the materiality of such omission.

### (i) CATEGORY NINE: WILLIAMS' PURPORTED LOANS

The SEC contends that Williams failed to disclose that he and his entities, Scipio and LF42, received purported loans from Lendacy. The SEC first points to Exhibit C-1 of the Operating Agreement. (Dkt. 200-6 at 11-14) Williams admits that Exhibit C-1, which was provided to investors who had a relationship with Lendacy, does not disclose that Williams or his entities, Scipio and LF42, would receive purported loans from Lendacy. (Stipulation of Agreed Material Facts, Dkt. 220 at ¶ 8) Williams admits in his deposition that he failed to disclose to all investors that he received $1.5 million from Lendacy, which he used for the purchase of three luxury apartments and parking spaces. (Dkt. 200-15 at 339:1-7) The SEC also points to the deposition of Ms. Locke (Dkt. 200-20 at 6:9-25; 12:3-19), the declaration of Mr. Vargas (Dkt. 200-50 at ¶¶ 14-16), and the deposition of Ms. Rivera (Dkt. 200-56 at 2-4), all of whom state that they or other investors were unaware that Williams and Williams' entities were receiving loans from Lendacy, funded by investor money.

Regarding Scipio, in particular, the SEC points to Williams' own admission on file. In response to the SEC's first request for admissions, Williams admits that he did not disclose to investors or prospective investors that Scipio received funds from

Lendacy at the time or before such funds were disbursed to Scipio. (Dkt. 200-14 at ¶ 22) Williams also admits in his deposition that he did not disclose Scipio's line of credit to all investors. (Dkt. 200-15 at 351:15-25, 352:1-10) Because Williams admits to this contention, the Court finds there is no genuine dispute of fact concerning this omission.

Williams seeks to create a factual dispute by claiming that he "personally disclosed to several Kinetic Funds investors that he, Scipio, and LF42 received loans from Lendacy." (Dkt. 221-2 at ¶ 210) But disclosing to several investors, even if true, does not equate to disclosing to all investors, which he unequivocally admits he had not done. (See Dkt. 200-15 at 339:4-7, 352:8-10) Williams does not explain why disclosing to some, but not all investors, does not create an omission for those investors who did not know Lendacy was providing loans to Williams and his entities.

The Court further concludes these omissions were material because there was a "substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable shareholder as having significantly altered the 'total mix of information available.'" Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988). Failing to disclose to investors that their money would be used for the payment of one's personal expenses or for the benefit of one's entities certainly represents a material omission. See Smart, 678 F.3d at 857.

### (j)   CATEGORY TEN: ZEPHYR AEROSPACE

The SEC argues that Williams failed to disclose that he used at least $497,300.00 of investor assets to invest in Zephyr Aerospace, a private company that

was not listed on a U.S. exchange. (Dkt. 200 at 13) For support, the SEC points to Exhibit B-1 and C-1 of the Operating Agreement given to investors, which fails to state that at least $497,300.00 in investor asserts were used to invest in Zephyr. (Dkt. 200-6 at 6-10) The SEC also relies on Williams' deposition, in which he admits that approximately $500,000.00 of investor assets were used invest in Zephyr Aerospace. (Dkt. 200-15 at 372:18-25, 373:1-25; 449:22-25) Williams also admits that Zephyr Aerospace was not listed on any U.S. exchange because "[i]t's a private equity investment." (Id. at 373:23-25)

As above, Williams seeks to evade his admission on two grounds. First, he contends that he disclosed to some investors that their assets were used to invest in Zephyr Aerospace. (See Dkt. 200-15 at 450:5-14) However, as explained above, disclosing to some investors does not equate to disclosing to all investors, and he fails to offer any explanation as to why disclosing to some investors but not all investors does not qualify as an omission. Second, as above, he argues that investor assets were not used to invest in Zephyr, but rather portfolio margin was employed. (Dkt. 221-2 at ¶¶ 140-143, 202, 209) However, for the reasons explained earlier, the Court rejects this argument because, even if true, margin was simply another way of using investor assets, specifically through the collateralization of such assets. See supra.

Finally, Williams' omission was material because Williams used investor assets to fund a personal business venture, failing to disclose to investors that their money would be used in this way. See Smart, 678 F.3d at 857.

### c.    SCHEME LIABILITY IN VIOLATION OF SECTIONS 17(A)(1) AND (3) AND RULES 10B-5(A) AND (C)

The SEC next contends that Williams violated Exchange Act Rules 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (3), which prohibit in connection with the purchase or sale or in the offer or sale of securities, "the employment of any device, scheme, or artifice to defraud; and the engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit on any person." See Rule 10b-5(a), (c), and § 17(a)(1), (3).

"Scheme liability occurs when a defendant employs 'any device, scheme, or artifice to defraud,' 17 C.F.R. § 240.10b-5(a) (Rule 10b-5(a)), or 'any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,' 17 C.F.R. § 240.10b-5(c) (Rule 10b-5(c))." IBEW Local 5959 Pension & Money Purchase Pension Plans v. ADT Corp., 660 Fed. App'x 850, 858 (11th Cir. 2016). "A scheme liability claim is different and separate from a nondisclosure claim." Id. (citation omitted). Because "[c]onduct itself can be deceptive," a defendant can be liable under § 10(b) and Rule 10b-5 for deceptive conduct absent a misstatement or omission." (citations omitted).

Williams disputes that he engaged in any deceptive or fraudulent conduct. As such, the Court addresses this dispute first before turning to the other elements of the statutes, including state of mind, the "in connection with" the purchase or sale (Rule 10b-5(a), (c)) or in the "offer or sale" (§ 17(a)(1), (3)) of securities, and the interstate commerce or mails elements.

### (1)   WILLIAMS' MISUSE AND MISAPPROPRIATION OF INVESTOR ASSETS

The SEC claims that Williams misappropriated at least $6.3 million of investor funds for his own personal enjoyment and that he misused investor assets by investing them in Zephyr Aerospace. (Dkt. 200 at 33) Specifically, as set forth above, the SEC claims that Williams (1) paid off his mother's mortgage using $37,000.00 of investor funds; (2) purchased real property for his personal use using $1,512,575.50 of investor assets; (3) purchased commercial property on behalf of his entity, Scipio, using $2,755,000.00 of investor assets; and (4) used $2,550,000.00 of additional investor assets in the form of two Lendacy loans on behalf of his entity, LF42, to provide financial support to his outside business ventures. (Dkt. 200 at ¶¶ 44-48)

The SEC provides overwhelming record evidence to support its contention that Williams misappropriated investor funds. (See, e.g., Dkt. 200-20 at 17-29; Dkt. 200-20 at 45; Dkt. 200-32 at 2-3; Dkt. 200-15 at 323:18-326:3; Dkt. 200-66; Dkt. 200-67; Dkt. 200-15 at 342:14-343:22; 344:1-348:19; Dkt. 200-20 at 35-44; Dkt. 200-28; Dkt. 200-29; Dkt. 200-36, Dkt. 200-37; Dkt. 200-32 at 6, 9-13; Dkt. 221-3 at 26-28)

For example, in regard to Williams using $1,512,575.50 of investor assets to purchase real property for himself in San Juan, Puerto Rico, Williams admitted in his deposition that he knew $1.5 million of investor assets were withdrawn from Kinetic Funds' bank account on March 21, 2017. (Dkt. 200-15 at 325:7-17; 328:2-11) He then concedes that the same amount of money was transferred to Lendacy on the same date. (Id. at 329:13-24) Williams then admits that on March 23, 2017, he executed a

loan agreement with Lendacy for the same amount of money. (<u>Id.</u> at 333:14-19) And

he admits he used this "line of credit of $1.5 million dollars" in order "to purchase the

house and apartment in Puerto Rico." (<u>Id.</u> at 334:16-21) In short, there is no dispute

that Williams misappropriated investor assets for his personal use.

Williams concedes that he received loans from Lendacy for the benefit of

himself and his entities, (<u>see</u> Dkt. 221-2 at ¶¶ 169-210), but he claims that the loans

were not funded with investor funds. (<u>See</u> Dkt. 221-2 at 51-66) Instead, Williams

contends that he employed portfolio margining to obtain loans from Lendacy. (<u>See</u> <u>id.</u>;

see Dkt. 202 at 10-12) For the reasons explained above, the Court does not find that

Williams has raised a dispute of fact as to whether he used investor funds to obtain

these loans from Lendacy because, even if he employed portfolio margin, Williams

does not dispute that he was only able to use margin obtained from IB because of the

existence of investor assets in the first instance. Furthermore, as the preceding

paragraph plainly demonstrates, $1.5 million of *investor assets* from Kinetic Funds, not

margin from IB, were transferred to Lendacy, which allowed Williams to obtain a loan

from Lendacy to purchase real property for his personal use.

Based on the foregoing, the Court finds that Williams' misappropriations of

investor funds for his personal use serve as a basis for establishing scheme liability. <u>See</u>

<u>SEC v. Zandford</u>, 535 U.S. 813, 821-22 (2002) (concluding that a stockbroker's sale of

client securities and subsequent misappropriation of the proceeds of that sale was

deceptive and violated Rule10b-5 because it was not authorized by or disclosed to the

clients and was thus properly viewed as a course of business that used fraud and

deceit.); <u>SEC v. Laura</u>, 680 F. Supp. 3d 204, 233 (E.D.N.Y. June 28, 2023) ("It is well established that an undisclosed intent to misappropriate funds is sufficient to establish scheme liability on a motion for summary judgment.") (first citing <u>Commodity Futures Trading Comm'n v. McDonnell</u>, 332 F. Supp. 3d 641, 720 (E.D.N.Y. 2018); and then citing <u>Zandford</u>, 535 U.S. 813, 819-20, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002)).

In light of the Court's finding, the Court need not address the SEC's alternative ground for establishing scheme liability against Williams, that is whether he "papered credit agreements, collateralized by supposed future payouts, in order to hide his use of investor assets to fund his personal expenses and business ventures." (Dkt. 200 at 31)

### d. WILLIAMS' STATE OF MIND AS TO HIS MISSTATEMENTS, OMISSIONS, AND MISAPPROPRIATIONS

The SEC claims that Williams acted with scienter, or at least negligence, in misappropriating investor funds, pursuant to Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c), and making the ten categories of allegedly misleading misrepresentations and omissions referenced above, pursuant to Sections 17(a)(2) and Rule 10b-5(b).

To recall, for claims under Section 17(a)(1) and Rule 10b-5, the SEC must establish a defendant acted with scienter. <u>S.E.C. v. Merch. Cap., LLC</u>, 483 F.3d 747, 766 (11th Cir. 2007). But for claims under Sections 17(a)(2) and (3), the SEC need only demonstrate negligence. <u>Id.</u>

Given the fact issues regarding the accuracy of the account statements

(Category Six) and the portion of the Kinetic Funds' portfolio that was margined (Category Eight), the Court cannot conclude whether Williams knew or should have known that the materials investors received, from either Kinetic Funds or Lendacy, were deficient in this regard.

Consequently, the Court will limit its analysis of Williams's scienter and negligence to his misrepresentations and omissions regarding: (a) Lendacy's funding source (Category One); (b) Williams's ownership of Lendacy (Category Two); (c) whether all investor funds were invested in U.S.-listed financial products (Category Three); (d) whether Williams misrepresented to investors that their principal would be secure because the KFYield portfolio would be hedged with listed options (Category Four); (e) the liquidity of the KFYield assets (Category Five); (f) the performance of the KFYield portfolio (Category Seven); (g) the loans he and his entities received from Lendacy (Category Nine); and (h) his use of investor assets to invest in Zephyr Aerospace (Category Ten). Because the misrepresentations that the SEC claims Williams made in Categories Nine and Ten reflect the misappropriations the SEC contends Williams also perpetrated, the Court's analysis as to Williams' state of mind under these categories will necessarily apply to the asserted misappropriations. See supra.

### (1)    SCIENTER UNDER RULE 10B-5(A)-(C) AND SECTION 17(A)(1)

The Court proceeds by first analyzing whether the SEC has established Williams acted with scienter in making the misrepresentations and omissions under

Rule 10b-5(b). The Court will also address whether the SEC has established Williams acted with the requisite scienter in engaging in the misappropriation of investment funds under Section 17(a)(1) and Rule 10b-5(a), (c).

Scienter is "the mental state embracing [the] intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). The SEC can prove scienter by demonstrating that Williams acted with severe recklessness. Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961 (5th Cir. 1981) (en banc).[8] "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989).

As an initial matter, the Court notes that Williams, in his motion for summary judgment, does not address the element of scienter. (See generally, Dkt. 202) Williams only opposes the SEC's claim that he acted with scienter in response to the SEC's motion for summary judgment. As a result, the Court proceeds with the following analysis based on the SEC's motion for summary judgment and Williams' response in opposition thereto.

In the motion, the SEC argues Williams "knew his representations to investors

---

[8] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir.1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued on or before September 30, 1981).

were false because he directed both the transfer of KFYield assets to Lendacy and Lendacy's subsequent 'loans' to himself and his entities." (Dkt. 200 at 35) The SEC claims that he controlled both KFYield and Lendacy and their bank accounts. (Id.)

Second, the SEC asserts that he controlled the investment decisions for Kinetic Funds and, as a result, knew that his representations to investors about the use of investor assets, the performance of Kinetic Funds, and the source of Lendacy's funding were false. (Id. at 35-36) Third, the SEC claims he had ultimate authority over the marketing materials and Bloomberg reports provided to investors. (Id.)

William raises two arguments in response. First, he claims that he did not have ultimate control and authority over the Lendacy marketing materials. Second, he asserts that he relied on the advice of his counsel and professional advisers when distributing Kinetic Funds materials to investors. The Court addresses each ground in turn.

In regard to the first category concerning the misrepresentation made in the Lendacy marketing materials about the source of Lendacy's funding, Williams claims that the SEC does not state *who* led prospective investors to believe Lendacy had a separate funding source or *who* led prospective investors to believe that their entire capital would be invested in KFYield. The SEC points to the affidavit of a prospective investor, Wilmer Gonzalez Vargas, who is the administrator of the Plan de Pensiones Ministerial, Inc. (Ministerial Pension Plan) in Puerto Rico, to support its contention that Williams led prospective investors to believe Lendacy had a separate funding source and that their entire capital would be invested in KFYield.

73

The Ministerial Pension Plan was established in 1974 for the benefit of retired ministers of the Iglesia de Dios Pentecostal, Movimiento Internacional, Region of Puerto Rico. (Dkt. 200-50 at ¶ 4) Mr. Vargas stated that, at the beginning of 2017, "with an interpreter, Williams and Kelly Locke came to the Pension Plan office and made a presentation to him and the Pension Plan Board of Directors on investments with Kinetic Funds as well as the opportunity to obtain loans through a related company called Lendacy." (Id. at ¶ 6) At the meeting, Mr. Vargas claims that "Williams gave us a marketing brochure explaining Kinetic Funds, and in particular the KFYield fund." (Id.) Mr. Vargas also claims that "Williams spoke about investing in KFYield and Locke explained the opportunity to obtain loans with Lendacy." (Id. at ¶ 7) The Pension Plan ultimately invested a total of $800,000.00 into KFYield. (Id. at ¶ 13) However, Mr. Vargas states that the Pension Plan "was never told that the money it invested in KFYield could be used to finance its own loans with Lendacy," "was never told that the money it invested in KFYield could be used to finance the loans of others with Lendacy," and "was never told that the money it invested in KFYield could be used to finance Williams's loans or Williams's companies with Lendacy." (Id. at ¶¶ 14-16)

Williams, however, claims that he did not attend the Ministerial Pension Plan meeting and, thus, cannot be held responsible for what Ms. Locke presented to Mr. Vargas and others at that meeting. Specifically, Williams points to the deposition of Carla Mendez, who acted as the interpreter at that meeting and testified that Williams was not present. (Dkt. 221-3 at 23:16-18) Thus, Williams asserts that he has provided

evidence to create a factual dispute concerning his presence at the Ministerial Pension Plan meeting.

The Court acknowledges that Williams has properly identified a dispute of fact concerning his presence at the meeting. However, the dispositive issue for the Court to resolve is whether a genuine dispute of material fact exists regarding whether Williams made a material misrepresentation. See Rule 10b-5(b).

To recall, in Janus Capital, the Supreme Court held that a person may be held primarily liable under § 10(b) and Rule 10b-5(b) for "making" a misleading statement if he or she had "ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. at 142. Accordingly, as an initial matter, the Court does not agree with Williams' view that he was required to be physically present at the Pension Plan meeting to be deemed to have made a misleading statement. See id. The key inquiry is whether he held "ultimate authority" over the "content" of the marketing materials at issue and "whether and how to communicate" those marketing materials to prospective investors. See id.

However, even with this standard in mind, questions of fact remain as to whether Williams made this misrepresentation to Mr. Vargas, as contemplated by Rule 10b-5(b) and Janus. Williams provides evidence to dispute the SEC's contention that he had ultimate authority and control over the contents of the Lendacy brochures given to investors like Mr. Vargas.

The SEC contends that Williams began, in 2015, to market Kinetic Funds with Lendacy. (Dkt. 200 at ¶ 19) In his Declaration, Williams states that he "did not have

an ownership interest in, control over, and exercise ultimate authority over Lendacy" during the time period in question. (Dkt. 221-2 at ¶ 23) In his Responses to the SEC's Requests for Admissions, when asked to admit whether he controlled Lendacy, Williams stated, in relevant part, that "Ms. Locke, for and on behalf of Lendacy, . . . approved and created marketing materials . . . independently from, and without any involvement of [him]." (Dkt. 200-14 at ¶ 5) In her deposition, Locke claimed the opposite. She specifically testified that Williams had "ultimate authority over the content of *this* Lendacy brochure." (Dkt. 200-20 at 58) (emphasis added)

On this point, however, it is unclear which Lendacy brochure Ms. Locke is referring to as the SEC provides only a portion of her testimony for the Court to review. (See id.) The Court further notes it is unclear from the record whether all investors received the same Lendacy brochures and when they received the brochures. Based on the statements Williams made in his deposition, both of these questions appear to be important for resolving the dispute of who had ultimate authority and control over the contents of the Lendacy brochures given to investors.

When questioned about who had ultimate authority and control over Lendacy's marketing materials, Williams testified that "[w]hen Kelly took over, Kelly Locke." (Dkt. 200-15 at 58) According to Williams, Kelly Locke took over as President of Lendacy in 2014. (Id.) Kelly Locke, however, testified that, while she did not "recall the exact date that [her] title changed" from Operations Director of Lendacy to President, she was promoted to President by "the time that [Kinetic Funds] moved to

Puerto Rico in 2016." [9] (Dkt. 200-20 at 2) Williams, for his part, unequivocally admits that prior to Locke becoming President, he exercised ultimate authority and control over the Lendacy marketing materials. (Dkt. 200-15 at 229:19-22) Because the SEC argues that Williams began to market Kinetic Funds with Lendacy in 2015, and Williams disputes his ultimate authority and control over the Lendacy marketing materials after Locke became President – which occurred at some point (likely) in 2016 – a genuine dispute of material fact remains as to whether Williams exercised ultimate authority and control over Lendacy marketing materials given to investors *throughout* the entire period (2015-2019) of the SEC's investigation of this matter.

In short, at the summary judgment stage, the Court finds that the SEC has not established Williams' scienter as it relates to the question of who had ultimate authority and control over the contents of the Lendacy marketing materials. Simply put, if Williams did not "make" the misrepresentations and/or omission to investors regarding the source of Lendacy's funding, then he did not have the requisite "intent to deceive, manipulate or defraud." Ernst & Ernst, 425 U.S. at 193.

For each of the remaining categories, the SEC points to Kinetic Funds' Operating Agreement and Kinetic Funds' marketing materials to demonstrate that a misrepresentation or omission was made. Unlike Lendacy and its marketing materials,

---

[9] The Court is aware that the SEC has attached to its motion for summary judgment emails from Kelly Locke from 2015 sent to different individuals, including Williams, in which her signature block states that she was the "Operations Director" of Lendacy. (See Dkts. 33, 34; 36-38) As such, the Court believes that Locke likely became President of Lendacy in 2016. However, even if true, as explained above, a dispute of fact remains as to who exercised ultimate authority and control over the Lendacy marketing materials given to investors once Locke became President.

Williams unequivocally admits he controlled Kinetic Funds. (See Defendant Williams' Responses to the SEC's First Request for Admissions, Dkt. 200-14 at 1 (admitting control over Kinetic Group and Kinetic Funds)) However, to absolve himself of liability, Williams pivots, asserting that he relied on the advice and guidance of his attorneys and other professional advisers "to make sure that all materials provided to potential and actual investors and all transactions between and among Kinetic Group, Kinetic Funds, Kinetic Partners, LF42, Lendacy, Scipio, El Morro, KIH, investors, members, shareholder and/or himself contained all necessary disclosures and fully complied with all laws and regulations." (Dkt. 221 at 31) (citing Dkt. 221-2 at ¶¶ 65-69, 213-214)

To succeed with a defense of good faith reliance on the advice of counsel, the defendant must show that 1) he has fully disclosed all relevant facts to his counsel and 2) he relied in good faith on his counsel's advice. SEC v. Huff, 758 F. Supp. 2d 1288, 1348 (S.D. Fla. Sept. 30, 2010). See United States v. Parker, 839 F.2d 1473, 1482 (11th Cir. 1988). Similarly, to succeed with a defense of good faith reliance on the advice of his professional advisers, a defendant must show that: (1) he made a complete disclosure to the professional, (2) he sought the advice of the professional as to the appropriateness of the challenged conduct, (3) he received the professional's advice that the conduct was appropriate, and (4) he relied on that advice in good faith. Huff, 758 F. Supp. 2d at 1349.

As for the second category regarding Williams' failure to disclose his majority ownership of Lendacy, the Court finds that Williams' scienter has been established in

regard to this omission.

As stated above, Williams testified that he believed it was not important for investors to know that he was the majority owner of Lendacy. (See Dkt. 200-15 at 146) But, when questioned as to why he believed it was not important for investors to know this information, he responded, "[m]y attorney obviously did not feel it was necessary to put it in [the Operating Agreement]." (Id.) In his Declaration, Williams states that "Kinetic Funds' attorneys drafted, reviewed, provided edits and comments, and approved all versions of the Subscription Agreements, Offering Questionnaires, and Operating Agreements before they were provided to Kinetic Funds' prospective and actual investors and to Kinetic Funds' third-party referral agents." (Dkt. 221-2 at ¶ 65) Williams also states that he never approved providing those materials to a prospective or actual investor or to a third-party referral agent "until [he] had first confirmed that that version of the Subscription Agreement, Offering Questionnaire, or Operating Agreement had been reviewed and approved by Kinetic Funds' attorneys." (Id. at ¶ 66) Williams states that he "relied on the advice and guidance of Kinetic Funds' attorneys and other professional advisers to make sure that all Subscription Agreements, Offering Questionnaires, and Operating Agreements that Kinetic Funds and I provided to potential and actual investors complied with all applicable laws and regulations and properly and adequately made all necessary disclosures." (Id.)

Notwithstanding Williams' statements, Williams provides no evidence that he fully disclosed all relevant facts to his counsel or made a complete disclosure of the same to his professional advisers. Specifically, Williams does not state that he

informed his counsel or his professional advisers that he was diverting investor money from KFYield to Lendacy in order to fund unsecured loans for himself and his entities. (See generally, Dkt. 221-2) Williams produces no affidavit from his counsel or his professional advisers demonstrating their knowledge that Williams was engaging in this conduct. It is not at all clear that had they realized Williams was engaging in such conduct, they would have agreed that it was not necessary for investors to be aware (1) that the private-sector funding company referred to in the Operating Agreement was Lendacy, and (2) that Williams held a majority ownership in Lendacy. Thus, Williams' scienter has been established as to this omission because Williams fails to show that he made a complete disclosure of all relevant facts to his counsel and/or professional advisers. See, e.g., Merchant Capital, LLC, 483 F.3d at 772 (advice of counsel defense is only available if such advice "was based on a full and complete disclosure" of the relevant facts).

Regarding the third category – whether all investor funds were invested in U.S.-listed financial products – the Court finds that Williams' scienter has been established as to this misrepresentation. As mentioned above, Williams concedes that he "told investors that their money would be invested in income-producing U.S. listed financial products," as reflected in the Kinetic Funds Operating Agreement. (Stipulation of Agreed Material Facts, Dkt. 220 at ¶ 10) But, as the Court has already found above, investor capital was instead diverted to Lendacy, which was not a U.S.-listed financial product.

To dispute his scienter, Williams claims, in his Declaration, that he "relied on

the advice and guidance of my attorneys and other professional advisers to structure all transactions between and among Kinetic Group, Kinetic Funds, Kinetic Partners, LF42, Lendacy, Scipio, El Morro, KIH, investors, members, shareholder, and/or me and to ensure that all such transactions fully complied with all laws and regulations." (Dkt. 221-2 at ¶ 214) He further claims that his attorneys reviewed all materials related to Kinetic Funds that were provided to investors.

Williams identifies two individuals and one entity that provided him with such advice. Williams states that: (1) Phillip Handin, Esq. – with Williams' approval and based on information he provided – prepared the offering documents for Kinetic Funds and the corporate formation documents for his entities, (Dkt. 200-15 at 126:24-127:13, 137:20-138:1, 162:3-164:17, 165:5-17; Dkt. 221-2 at ¶¶ 4, 13, 18, 27, 40, 45, 50); (2) BDO, an accounting firm, provided him advice on how to structure El Morro, (Dkt. 200-15 at 411:13-412:13); and (3) Jeanelle Alemar-Escabi, Esq. created the Lendacy lines of credit, *i.e.* the Lendacy loans, for Scipio and LF42. (Id. at 413:25-415:21)

The problem for Williams is that he concedes none had any involvement in the operation of Kinetic Funds, KFYield, or Lendacy. (Id. at 413-417) Williams does not testify that any were aware that investor capital (or margin) was being transferred to Lendacy, or that they provided him with the advice to make these transfers. Indeed, the opposite is true because, by Williams' own admission, his attorneys and other professional advisers only reviewed, edited, and approved language in "Kinetic Funds' marketing materials, brochures, newsletters, reports, and other information," all of which reflected the fact that investors' money would be invested in U.S.-listed financial

products. (See Dkt. 221-2 at ¶¶ 67-68) None of the materials stated that investor capital (or margin) would be transferred to Lendacy.

Because Williams cannot establish a good faith reliance defense on information that was never disclosed to his counsel or professional advisers, the Court finds that the SEC has established Williams' scienter as a matter of law and that he knowingly diverted investor funds to Lendacy. See, e.g., Merchant Capital, LLC, 483 F.3d at 772 (advice of counsel defense is only available if such advice "was based on a full and complete disclosure" of the relevant facts). Notably, while Williams claims, in his Responses to the SEC's First Request for Admissions, that Ms. Locke "approved banking and financial transactions [and] approved loans" on behalf of Lendacy (Dkt. 200-14 at ¶ 5), Williams later concedes in his deposition that his signature is on the Signature Cards for both of Lendacy's bank accounts, establishing that he was the account holder for Lendacy's bank accounts and thus controlled the bank accounts. (Dkt. 200-15 at 248:13-257:6; Dkts. 200-62, 200-63)

The fourth category concerns whether Williams misrepresented to investors that their principal would be secure because the KFYield portfolio would be hedged with U.S.-listed options. The fifth category addresses Williams' misrepresentation that the KFYield assets had liquidity, and the seventh category concerns the misrepresentation made to investors about KFYield's portfolio performance. As above, Williams contends that he "relied on the advice and guidance of his attorneys and other professional advisers" to ensure that "all materials provided to potential and actual investors . . . contained all necessary disclosures and fully complied with all laws and

82

regulations." (Dkt. 221 at 30-31) Notwithstanding his testimony, Williams' claim fails because he does not state that he disclosed all relevant facts to his counsel or his professional advisers.

Specifically, Williams does not state he informed his counsel or professional advisers that he had actually hedged KFYield's IB account with U.S.-listed options, as opposed to the representation made to investors that he would hedge the KFYield *portfolio* with U.S.-listed options. See supra ("Hedging the collateral that supported the diverted funds, which Williams claims he did, is **not** equivalent to hedging investor funds and not diverting them.") (emphasis added). Regarding the liquidity of investor assets in KFYield, Williams fails to state that he disclosed to his counsel and professional advisers that he obtained unsecured loans funded by investor money for the benefit of himself and his entities. (See generally, Dkt. 221-2) Williams also does not state that he disclosed to his counsel and professional advisers that the Bloomberg reports given to investors would fail to include KFYield's margin balance or that his counsel and professional advisers approved of such omission. (See id.) Because Williams cannot establish a good faith reliance defense on information that was never disclosed to his counsel or professional advisers, the Court finds that the SEC has established Williams' scienter as a matter of law and that he knowingly made these misrepresentations to investors. See, e.g., Merchant Capital, LLC, 483 F.3d at 772.

The ninth category concerns Williams' failure to disclose that he and his entities, Scipio and LF42, received purported loans from Lendacy, while the tenth category addresses the SEC's claim that Williams failed to disclose his use of investor

assets to invest in Zephyr Aerospace. Williams concedes that his entity, LF42, "used approximately $497,300.00 of the funds [$2,100,000] it borrowed on its [Lendacy] credit lines to invest in Zephyr." (Dkt. 221-2 at ¶ 202) As set forth above, these categories also address Williams' misappropriation of investor funds pursuant to Rule 10b-5(a), (c) and Section 17(a)(1).

As above, Williams' attempt to establish a good faith reliance on counsel defense fails. Williams concedes that Ms. Alemar-Escabi, who allegedly created the Lendacy lines of credit for these loans, had **no** involvement in the operation of Kinetic Funds, KFYield, or Lendacy. (Dkt. 200-15 at 415:17-21) This is a significant concession because it means that Ms. Alemar-Escabi was unaware that Williams was transferring investor assets from KFYield to Lendacy or, if true, using portfolio margining to fund the Lendacy loans. Nor was Ms. Alemar-Escabi aware that it was investor money being used for Williams' personal benefit. On this record, Williams has not established a good faith reliance on counsel defense because he provides no evidence that he made a complete disclosure of these facts to Ms. Alemar-Escabi. Because Williams proffers no other evidence to dispute the SEC's evidence as to his state of mind, and in light of his control over the bank accounts of Kinetic Funds and Lendacy, the Court finds that no reasonable jury could conclude that Williams did not act with scienter in making these omissions and engaging in these misappropriations. See McDonald, 863 F.2d at 814. (See Dkt. 200-14 at ¶ 4; Dkt. 200-15 at 248:13-257:6; Dkts. 200-62, 200-63)

In light of the foregoing, the Court finds that the SEC has established Williams

acted with scienter when making the misrepresentations and omissions referenced above, pursuant to Rule 10b-5(b), and that he acted with the requisite scienter when engaging in the misappropriation of investor funds for purposes of scheme liability, pursuant to Rules 10b-5(a), (c), and Section 17(a)(1).

The Court also concludes that the SEC has established Williams acted with the requisite scienter to establish scheme liability in an alternative manner. In Lorenzo, as explained above, the Supreme Court ruled that scheme liability includes the "dissemination of false or misleading material with intent to defraud," 139 S.Ct. at 1100. See SEC v. Davison, No: 8:20-cv-325-MSS-AEP, 2021 U.S. Dist. LEXIS 140236 at *10 (M.D. Fla. Mar. 8, 2021) ("A defendant may be found to have violated Rule 10b-5(a) or (c) if he "disseminate[s] false or misleading statements to potential investors with the intent to defraud.") (citation omitted).

Here, Williams' knowing dissemination of materially misleading or false Kinetic Funds materials to potential and actual investors that either misrepresented or omitted: (a) Williams' ownership of Lendacy (second category); (b) that investor's investment would only be invested in U.S.-listed financial products (third category); (c) that investors' principal would be secure because 90% of the KFYield portfolio would be hedged with U.S.-listed options (fourth category); (d) that the KFYield assets had liquidity (fifth category); (e) that KFYield's reported portfolio performance matched its *actual* performance (seventh category); (f) that he received loans from Lendacy on behalf of himself and his entities (ninth category); and (g) that he used investor money to invest in Zephyr Aerospace (tenth category) are sufficient to

establish scheme liability violations under Rule 10b-5(a), (c), and § 17(a)(1), (3).

Williams provides no evidence to demonstrate that he did not knowingly distribute misleading or false materials to potential and actual investors that either misrepresented or omitted the above categories. He attempts to evade responsibility by claiming that he did not control the decisions of Kinetic Funds, which Kinetic Group managed. Williams also claims that he did not form Kinetic Funds or manage it. Those claims fail.

The SEC provides proof that Williams is the registered agent and managing member of Kinetic Group. (See Dkt. 200-16 at 2, Articles of Organization for Florida Limited Liability Company Kinetic Group). Williams also concedes that he filed a Form D on behalf of Kinetic Funds with the SEC in October 2016, claiming an exemption under Rule 506 (c) of the Securities Act for Kinetic Funds' pooled investment fund interests with a first sale date of October 2012. (Id.) Williams listed himself as the "Managing Director" of Kinetic Funds on the form. (Dkt. 200-17 at 2, 5)

As set forth above, Williams claims that his attorney, Phillip. E. Handin, with his approval and based on information he provided, prepared the offering documents for Kinetic Funds and corporate formation documents for his various entities, including Kinetic Funds. (Dkt. 221-2 at ¶¶ 27, 66) The Court has already set forth the standard to establish a good faith reliance on the advice of counsel defense. Williams fails to establish such a defense because he provides no evidence that he disclosed all relevant facts to his counsel or that his counsel advised him that providing materials

that misrepresented or omitted the above categories of information was appropriate. See SEC v. Meltzer, 440 F. Supp. 2d 179, 189 (E.D.N.Y. 2006) (rejecting good faith reliance defense on summary judgment where "there [wa]s nothing in the record to demonstrate that [defendant] made a complete disclosure, nor [wa]s there any indication that counsel advised [defendant] that the conduct was appropriate"). As explained above, Williams also concedes that Mr. Handin had **no** involvement in the operation of Kinetic Funds. (See Dkt. 200-15 at 417:5-8)

In sum, Williams provides no evidence to dispute the SEC's evidence that he exercised control over Kinetic Funds and the materials that investors received. As noted above, Williams also admits, in his Responses to the SEC's First Request for Admissions, that he controlled Kinetic Funds, thereby establishing that he knowingly disseminated misleading or false materials to potential and actual investors in order to attract them to invest in his hedge fund. (See Dkt. 200-14 at ¶ 4); see Lorenzo, 139 S.Ct. at 1100-02.

### (2)   NEGLIGENCE UNDER SECTIONS 17(A)(2) AND (A)(3)

The SEC argues that, even if the Court finds that Williams' actions were not conducted with scienter, the undisputed facts show that his actions were performed negligently. (See Dkt. 200 at 36) Williams, relying on the same arguments made in support of his contention that he did not act with scienter, asserts that the SEC has not established that he "acted negligently when he relied on his attorneys and other professional advisers for advice and guidance." (Dkt. 221 at 31)

87

To establish negligence for purposes of Sections 17(a)(2), the SEC must show a failure to exercise a standard of reasonable care. SEC v. City of Miami, 988 F. Supp. 2d 1343, 1362 (S.D. Fla. Dec. 27, 2013); see also S.E.C. v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997) (describing negligence in securities context as the failure to exercise reasonable care or competence). "Factual allegations supporting an inference of scienter will also satisfy the lower standard of negligence required for claims under Sections 17(a)(2) and (3) of the Securities Act." SEC v. Complete Bus. Sols. Group, 538 F. Supp. 3d 1309, 1331 (S.D. Fla. May 11, 2021) (citing S.E.C. v. Coplan, No. 13-62127, 2014 U.S. Dist. LEXIS 22796, 2014 WL 695393, at *4 (S.D. Fla. Feb. 24, 2014)).

In light of the Court's finding that the SEC has sufficiently established their scienter allegations on their Rule 10b-5 claims as it relates to the second (Williams' ownership of Lendacy), third (Investment in U.S. listed financial products), fourth (Secure Principal), fifth (the liquidity of KFYield's assets), seventh (KFYield's portfolio performance), ninth (Williams' purported loans) and tenth (Williams' investment in Zephyr Aerospace) categories of misrepresentations and omissions, and because the SEC claims that Williams negligently violated Section 17(a)(2), the minimum state of mind of negligence has also been established as it relates to these categories. See SEC v. Kingdom Legacy Gen. Partner, LLC, No. 2:16-cv-441-FtM-38MRM, 2017 U.S. Dist. LEXIS 12717 at *21 (M.D. Fla. Jan. 31, 2017). The Court also finds that Williams' scheme liability has been established under Section 17(a)(3) for the same reasons provided above.

Although the Court has found that Williams' scienter has not been established in regard to the first category of misrepresentation and/or omission made to investors in Lendacy marketing materials about the source of Lendacy's funding after Ms. Locke became President of Lendacy, the Court concludes that there is no dispute of fact as to whether Williams acted negligently under this category pursuant to Section 17(a)(2).

As an initial matter, unlike Rule 10b-5(b), there is no requirement that a defendant "make" a misrepresentation for purposes of violating Section 17(a)(2). See SEC v. Spartan Sec. Grp., Ltd., No. 8:19-cv-448-T-33CPT, 2019 U.S. Dist. LEXIS 94135 at *9 (M.D. Fla. June 5, 2019) ("As explained by the Eleventh Circuit, 'any attempts by the defendants to import the [Supreme] Court's narrow holding [in Janus Capital Corp. v. First Derivative Traders, 564 U.S. 135, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011)] to the entirety of § 17(a) is untenable on its face.'") (quoting Big Apple Consulting, 783 F.3d at 796).

To recall, § 17(a)(2) renders it "unlawful for any person in the offer or sale of any securities . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact." (Emphasis added). In Big Apple Consulting, the Eleventh Circuit held that "the text of [§ 17(a)(2)] suggests that . . . it is irrelevant for purposes of liability whether the seller uses his own false statement or one made by another individual." 783 F.3d at 797 (citing SEC v. Tambone, 550 F.3d 106, 127 (1st Cir. 2008). Accordingly, the Court finds that Williams need not be the maker of the statements made to investors in the Lendacy brochures in order to be held

89

liable under Section 17(a). See Spartan Sec. Grp., 2019 U.S. Dist. LEXIS 94135 at *9-10.

Turning to the evidence in the record, the Court concludes that the SEC has established Williams' negligence even if he did not "make" a misrepresentation or omission concerning Lendacy's funding source to investors.

Williams does not dispute that he obtained investor money (or margin from investor money) in the form of loans from Lendacy for the benefit of himself and his entities. (See Dkt. 221-2 at ¶¶ 169-210) The question, for purposes of § 17(a)(2), is whether he obtained investor money "by means of any untrue statement of a material fact or any omission to state a material fact." See § 17(a)(2). At least one example proves that he did and that it was, at a minimum, in a negligent manner.

Regarding the $2,755,000.00 purchase of the historic bank on behalf of his entity, Scipio, Williams concedes in his deposition that he "was aware" investor funds were withdrawn from Kinetic Funds in that approximate amount, and then subsequently transferred to Lendacy on behalf of Scipio in order for the loan to be made to Scipio. (See Dkt. 200-15 at 347:1-348:19) Williams claims that Lendacy staff authorized the deposits of those sums, but even if true, Williams relied on their false statements and/or omissions to investors concerning the source of Lendacy's funding in order to obtain investor money for his benefit. See Big Apple Consulting, 783 F.3d at 797. That reliance was negligent as no reasonable juror could find that Williams exercised reasonable care or competence by receiving approximately $3 million in a loan he admits he knew was funded by investor money in order to purchase a bank on

behalf of an entity in which he concedes he is the majority owner of. (See id. at 87) To recall, Williams has already conceded that: (1) the Operating Agreement investors received from Kinetic Funds never disclosed that Williams or his entities would receive loans from Lendacy; (2) the Operating Agreement explicitly stated that their investment would only be invested in U.S.-listed financial products; and (3) Lendacy is not a U.S.-listed financial product. (Dkt. 220 at ¶¶ 8, 10, 12) In light of the foregoing, the Court finds that the SEC has established Williams' negligence as it relates to the omission made to investors concerning the source of Lendacy's funding.

Considering the factual disputes noted above, the Court will proceed with the remaining sections by focusing on Williams' misappropriations and the first (Lendacy's funding source), second (Williams' ownership of Lendacy), third (Investment in U.S. listed financial products), fourth (Secure Principal), fifth (the liquidity of KFYield's assets), seventh (KFYield's portfolio performance), ninth (Williams' purported loans) and tenth (Williams' investment in Zephyr Aerospace) categories of misrepresentations and omissions.

### e. WHETHER THE MISREPRESENTATIONS, OMISSIONS, AND MISAPPROPRIATIONS WERE MADE "IN CONNECTION WITH" THE OFFERING, PURCHASE OR SALE OF SECURITIES

Williams claims that since the SEC has not specifically identified when each of the misrepresentations and omissions were made, "it is impossible to know if they were made 'in connection with' the offer, purchase or sale of securities. For example, [he contends] it is possible they were made three months *after* the investors had already

invested or one year *before* they had even begun thinking of making an investment." (Dkt. 221 at 28) (emphasis in original). Williams also contends that Plaintiff has not identified a specific securities transaction that the alleged misappropriations are "in connection with" because the SEC only points to misappropriations that occurred *after* the investors had already invested in Kinetic Funds. (Id. at 28-29); (see also Dkt. 202 at 9-10) The SEC, however, argues that the "in connection with" requirement was met because "there is no dispute that investors received offering documents and marketing materials for Kinetic Funds that misrepresented and omitted the use of investor capital, the misappropriation of investor funds, and the performance of KFYield." (Dkt. 227 at 19)

"Federal courts have interpreted the 'in connection with' requirement broadly, (SEC v. Zandford, 535 U.S. 813, 819-20, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002)), particularly when the SEC is the plaintiff, (SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1983) (in SEC actions, the meaning of the 'in connection with' requirement 'remains as broad and flexible as is necessary to accomplish the statute's purpose of protecting investors.'))." SEC v. Langford, 2:08-cv-761-AKK, 2011 U.S. Dist. LEXIS 171320 at *13 (N.D. Ala. Aug. 8, 2011). Thus, "whenever assertions are made . . . in a manner reasonably calculated to influence the investing public," the 'in connection with' requirement is satisfied. SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968).

Here, the record evidence establishes that the "in connection with" requirement has been satisfied. Investors received a Subscription Agreement, Operating

Agreement, Offering Questionnaire, and Kinetic Funds' marketing brochures. (See Dkt. 200 at ¶¶ 11-14) However, the documents misrepresented or failed to disclose that: (1) the source of Lendacy's funding was investor money, (2) that Williams was the majority owner of Lendacy, (3) that not all of the investors' money would be invested in income-producing U.S. listed products, (4) that investors' principal was not secured because at least 90% of the KFYield portfolio was not hedged with U.S.-listed options, (5) that KFYield's assets had liquidity, (6) that the performance of the KFYield portfolio was actually worse than what was represented in the Bloomberg reports, (7) that Williams and his entities received loans from Lendacy, and (8) that Williams would invest investors' capital in Zephyr Aerospace. Thus, in light of the "broad" meaning of the "in connection with" requirement, and because investors received and relied upon misleading materials, the Court finds that the requirement has been satisfied. See SEC v. Merkin, No. 11-23585, 2012 U.S. Dist. LEXIS 155679, 2012 WL 5245561, at *8 (S.D. Fla. Oct. 3, 2012) (stating that the "in connection with" requirement is satisfied if the SEC shows that the material misrepresentations were relayed to the public in a way that a reasonable investor would rely on them).

As for Williams' contention that the misrepresentations and omissions may have been made *after* the investors had made an investment into Kinetic Funds, Williams' argument is without merit. "It is well established that '[b]ecause this is a civil enforcement action brought by the SEC, reliance, damages, and loss causation are not required elements [when alleging a securities fraud claim].' See SEC v. Morgan

Keegan & Co., 678 F.3d 1233, 1244 (11th Cir. 2012)." Kingdom Legacy, 2017 U.S. Dist. LEXIS 12717 at *11. See also SEC v. Smith, No. C2-cv-04-739, 2005 U.S. Dist. LEXIS 21427 at * (S.D. Ohio, Sept. 27, 2005) ("The point in time in which the investors received [the marketing materials] need not have been before they purchased the security[.]").

Regarding his misappropriation of investor funds, Williams asserts that the SEC has failed to establish the "in connection with" requirement because the misappropriations occurred *after* investors invested in Kinetic Funds. (See Dkt. 202 at 10; Dkt. 221 at 28-29) This claim similarly fails.

In Zandford, the SEC alleged that the stockbroker violated Rule 10b-5 by selling his customers' securities and then using the proceeds for his own benefit without the customer's knowledge or consent. 535 U.S. at 815. The defendant also made wire transfers that enabled him to withdraw specified sums from his customers' accounts. Id. at 816. As explained in Zandford, some of those transfers involved the defendant writing checks to himself from a mutual fund account held by his clients, "knowing that redeeming the check[s] would require the sale of securities." Id. at 821. Defendant argued that the sales of the securities themselves were lawful and that, even though the subsequent misappropriation of the proceeds was fraudulent, "the alleged scheme [was] not materially different from a simple theft of cash or securities in an investment account." Id. at 820. Thus, he contended that the "in connection with" requirement was not satisfied because the subsequent misappropriation of investor proceeds did not have the requisite connection with the sales of securities. The Supreme Court

94

disagreed, holding that, because the SEC's complaint "describe[d] a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide," "[t]hose breaches were therefore 'in connection with' securities sales within the meaning of" Section 10(b). Id. at 825.

Here, Williams' misappropriations similarly coincided with the purchase of securities for KFYield investors. Williams concedes that when investors deposited their capital into Kinetic Funds' bank account in order to invest in KFYield (Dkt. 221-2 at ¶ 90), he kept a portion of investor capital in the bank account and transferred the remainder to Kinetic Funds' brokerage account at IB. (Dkt. 220 at ¶ 18) Williams concedes that securities for KFYield were then purchased with a combination of investor capital and margin, i.e., funds borrowed from its broker, IB. (Id. at ¶19) Williams testified that any "additional [or uninvested] cash" could then be used for "private equity or Lendacy." (Dkt. 200-15 at 198:16 – 199:3); (Dkt. 221-1 at 49)[10] Although Williams claims that the cash ultimately used to fund the Lendacy loans he and his entities received was margin from IB, he does not and cannot dispute that the source of the margin came from investor capital in the first instance. Thus, whether Williams used investor capital or margin to fund the Lendacy loans, Williams misappropriated investor cash by using such cash to fund the Lendacy loans he

---

[10] Notably, Williams' deposition testimony and opposition to the SEC's motion for summary judgment appears to prove the SEC's case against him. In likely a slip-of-the-tongue, Williams first testifies in his deposition that, after purchasing securities for KFYield with a combination of investor capital and margin, any "additional [or uninvested] **cash**" could then be used for "private equity or Lendacy." (Dkt. 200-15 at 198:16 – 199:3); (Dkt. 221-1 at 49) (emphasis added) However, he later testifies that "margin," as opposed to investor "cash," was the source of the funding for the Lendacy loans. (Dkt. 200-15 at 199:22-24) However, the Court has found that Williams' asserted distinction makes no difference and does not drive the decision here.

received for the benefit of himself and his entities. In sum, the Court finds that the purchase of KFYield securities on margin coincided with the deposit of investor money into Lendacy (*i.e.* the misappropriations), thereby satisfying § 17(a)'s "in the offer or sale" and § 10(b)'s "in connection with the purchase or sale" of a security requirements. See Zandford, 535 U.S. at 825.

### f. WHETHER THE OFFERING, PURCHASE, OR SALE OF SECURITIES WERE OFFERED OR SOLD THROUGH THE USE OF INTERSTATE COMMUNICATIONS, COMMERCE, OR THE MAILS

The SEC claims that Williams misused and misappropriated investor assets through wire transactions. (Dkt. 200 at 34) Williams argues that, because the SEC has failed to identify a specific investor to whom the purported misrepresentations and omissions were made, "it is impossible to know if . . . those misrepresentations were made by means of interstate commerce and/or the mails." (Dkt. 221 at 29) Willaims further contends that the SEC has failed to identify any record evidence of emails sent to investors. (Id. at 30)

As above, Williams is mistaken in his contentions. Reliance is not an element the SEC is required to establish to prove a securities fraud violation. See Morgan Keegan & Co., 678 F.3d at 1244. But even if Williams were correct, his claim would still fail. The SEC provides record evidence, through the deposition of Ms. Locke, that investor capital was wire-transferred to the Kinetic Funds bank account, and a portion was then transferred to IB for investment in KFYield. (See Dkt. 227-3 at 2); see also SEC v. Cole, No. 17-56196, 2024 U.S. App. LEXIS 2665 at *4 (9th Cir. 2024)

("interstate commerce" requirement satisfied because the wire transfers occurred through different banks and financial institutions in different states). There is no dispute that BMO Harris Bank, which maintained the Kinetic Funds bank account, was located in Sarasota, Florida. (See e.g., Dkts. 200-13, 200-29  Further, there is no dispute that investors were located at least in Florida and Puerto Rico. (See e.g., Dkt. 200-20 at 11, 49-50)

Williams also admits that marketing materials and offering documents were e-mailed to investors and Kinetic Funds sales agents. (See, e.g., Dkt. 200-15 at 121:12-21 (regarding an email sent to an agent, Williams testified that "[t]here was a client at Consultiva that was interested in investing. They contacted us, requested the account opening document procedures and so we forwarded the account opening document procedures, which included the subscription agreement, the questionnaire, the operating agreement, and the exhibits.")) The Eleventh Circuit has held that "the internet is an instrumentality of interstate commerce." United States v. Hornaday, 392 F.3d 1306, 1311 (11th Cir. 2004).

Based on the foregoing, the Court finds that the SEC established that the alleged misrepresentations, omissions, and misappropriations were made by use of an "instrumentality of interstate commerce." See §17(a); Rule 10b-5.

In sum, the SEC has established that Williams misappropriated investor funds and engaged in the following categories of misrepresentations and omissions – first (Lendacy's funding source), second (Williams' ownership of Lendacy), third (Investment in U.S. listed financial products), fourth (Secure Principal), fifth (the

liquidity of the KFYield assets), seventh (KFYield's portfolio performance), ninth (Williams' purported loans) and tenth (Williams' investment in Zephyr Aerospace). Further, Williams acted with the requisite scienter for each of the misappropriations, misrepresentations, and omissions referenced above under § 17(a)(1), (3) and Rule 10b-5, except for the first category concerning Lendacy's funding source, which the Court finds he nevertheless acted with the requisite negligence to sustain a finding of a violation under §17(a)(2). Finally, the SEC has established that the "in connection with" and the "interstate commerce" requirements have been met.

As a result, although the SEC has not established Williams engaged in each category of misrepresentations and omissions referenced above, the Court nevertheless finds that summary judgment is due to be **GRANTED** in favor of the SEC. See Morgan Keegan & Co., 678 F.3d at 1248 ("[t]he SEC enjoys the authority to seek relief for any violation of the securities laws, no matter how small or inconsequential…. The SEC thus may seek a civil penalty against any defendant who has made a single misstatement or omission, [pursuant to Rule 10b-5], if material and made with scienter and in connection with the purchase or sale of securities."); see also Big Apple Consulting, 783 F.3d at 798 ("[T]o show a violation of § 17(a), '[i]t is not necessary that the SEC prove that the [d]efendants engaged in all three types of conduct' set forth in subsections (1) - (3). Instead, as properly instructed, '[a]ll that the SEC needs to prove to prevail is that the [d]efendants engaged in any one of the types of conduct.'). Here, the SEC has established a violation of all three types of conduct under both statutes.

### 3.   VIOLATIONS OF THE ADVISERS ACT (COUNTS VII, IX, XI, XIII)

Section 206(1) of the Advisers Act prohibits any investment adviser from, directly or indirectly, employing any device, scheme, or artifice to defraud any client or prospective client. Section 206(2) of the Advisers Act prohibits any transaction, practice, or course of business that operates as a fraud or deceit upon any client or prospective client. Section 206(4) of the Advisers Act, which is modeled on Sections 206(1) and (2), prohibits an investment adviser from, directly or indirectly, engaging in any act, practice, or course of business that is fraudulent, deceptive, or manipulative. The language of these provisions "is drawn from § 17(a)(1) and (3) of the Exchange Act" and conduct falling within § 17(a)(1) and (3) will fall within the analogous provisions of § 206 when committed by an investment adviser against a client or prospective client. See Steadman I.

"In order to establish a violation, each of these sections requires the SEC to show the investment adviser made a material misrepresentation with a culpable mental state." ZPR Inv. Mgmt v. SEC, 861 F.3d 1239, 1247 (11th Cir. 2017) (citing Steadman I, aff'd, 450 U.S. 91, 101 S. Ct. 999, 67 L. Ed. 2d 69 (1981) (interpreting sections 206(1)-(2)); SEC v. Steadman, 967 F.2d 636, 643, 647, 296 U.S. App. D.C. 269 (D.C. Cir. 1992) ("Steadman II") (interpreting section 206(4))). "While the material-misrepresentation element is the same for all three sections, the mental-state element for section 206(1) is different than that for sections 206(2) and (4)." ZPR Inv. Mgmt., 861 F.3d at 1247 (citations omitted). "Section 206(1) requires the SEC to show the adviser acted with scienter." Id. (citing Steadman I, 603 F.2d at 1134). "Sections

206(2) and (4) require no showing of scienter, and a showing of negligence is sufficient." See id. (citing Steadman II, 967 F.2d at 643 n.5, 647).

The SEC contends that Williams was an "investment adviser" within the meaning of the Advisers Act and that he engaged in multiple conflicts of interest, all of which form the basis of the misrepresentations, omissions, and misappropriations referenced above. (Dkt. 200 at 37-40) As demonstrated above, Williams violated Sections 206(1), (2), and (4) of the Advisers Act because the SEC has shown all of the elements for liability under Section 17(a) of the Securities Act and Rule 10b-5 of the Exchange Act, which are more stringent than the requirements to violate Sections 206(1), (2), and (4) of the Advisers Act. See SEC v. Lauer, No. 03-80612-CIV-MARRA/JOHNSON, 2008 U.S. Dist. LEXIS 73026 at *91 (S.D. Fla. Sept. 23, 2008). Thus, the remaining question is whether Williams acted as an "investment adviser" for Kinetic Funds, which Williams disputes. (See Dkt. 202 at 12-13; Dkt. 221 at 30-31)

Section 202(a)(11) defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). "This definition encompasses anyone who manages the funds of others for compensation or controls an investment advisory firm." SEC v. Nutmeg Grp., LLC, 162 F. Supp. 3d 754, 772 (N.D. Ill. Feb. 18, 2016) (citing SEC v. ABS Manager, LLC, 2014 U.S. Dist. LEXIS 175071, 2014 WL 7272385, at *4 (S.D. Cal. Dec. 18, 2014); SEC v. Bolla, 401

100

F. Supp. 2d 43, 59 (D.D.C. 2005) aff'd in part and remanded sub nom. SEC v. Washington Inv. Network, 475 F.3d 392, 374 U.S. App. D.C. 383 (D.C. Cir. 2007); SEC v. Berger, 244 F. Supp. 2d 180, 192 (S.D.N.Y. 2001). (Dkt. 200 at 38) (citations omitted). The SEC points to record evidence to establish that Williams is an investment adviser.

First, Defendant Kinetic Group is an investment adviser for Kinetic Funds, a private pooled investment fund. (Dkt. 200 at 10) The SEC relies on Williams' deposition testimony, in which he concedes that Kinetic Funds is "a private equity investment fund" and that Kinetic Group managed Kinetic Funds. (Dkt. 200-15 at 53:8-10, 60:12-16); (see also Stipulation of Agreed Material Facts, Dkt. 200-20 at 1 (noting that Kinetic Funds "filed a Form D with the SEC in October 2016 claiming an exemption under Rule 506(c) for its **pooled investment fund interests**")) (emphasis added) Thus, Defendant Kinetic Group acted as an investment adviser for Kinetic Funds.

The SEC next points to evidence that Williams founded, managed, and controlled Kinetic Group. In his deposition, Williams admits that his attorneys formed Kinetic Group at his direction. (Dkt. 200-15 at 61:8-16) Next, in the Articles of Organization for Kinetic Group, Williams designated himself as the registered agent and managing member of Kinetic Group. (See Dkt. 200-16 at 2). And in his Responses to the SEC's First Request for Admissions, Williams admits that he controlled Kinetic Group. (Dkt. 200-14 at 1)

Williams also carried out Kinetic Group's responsibilities as an investment adviser by directing Kinetic Funds' investments, communicating with investors about Kinetic Funds' investment strategy and performance, and soliciting investors to Kinetic Funds. In the Joint Stipulation of Agreed Material Facts, Williams concedes that he told investors that their money would be invested in income-producing U.S. listed financial products (Dkt. 220 at ¶ 10), that he advised investors that Kinetic Funds was a conservative blended fund and that their principal would be secure because the KFYield portfolio would be hedged with listed options, (id. at ¶ 13), and that he created the investment strategy for Kinetic Funds. (Id. at ¶ 23). This conduct "brings him within the bounds of the term 'investment adviser,' for purposes of the Advisers Act." See SEC v. Lauer, 478 Fed. Appx. 550, 557 (11th Cir. 2012) (finding that Lauer was an investment adviser because he "proffered advice directly to the Funds' investors when he hosted meetings and teleconferences with investors, and when he suggested in the Funds' newsletter that his market strategy could beat market returns")

Importantly, Williams received compensation for providing advice to investors. The SEC points to the Operating Agreement that investors received, which provided that the Class B and Class C member investors would be charged a 1% management fee for the operation of the funds. (Dkt. 200-6 at 8, 13) Ms. Locke also testified in her deposition that Kineitc Group charged Kinetic Funds a 1% management fee. (Dkt. 200-20 at 69) Because Williams admits that he managed and controlled Kinetic Group, Williams received the 1% management fee, through Kinetic Group, for managing

Kinetic Funds. (Dkt. 200-14 at ¶ 1)[11] In sum, Williams, like Kinetic Group, meets the definition of an "investment adviser."

Williams disputes the SEC's evidence on multiple grounds, all of which fail. First, he claims that his attorneys formed Kinetic Group, not him. But, as explained above, Williams admits that his attorneys formed Kinetic Group at his direction. (Dkt. 200-15 at 61:8-16)

Second, he claims that he is not "presently" the managing member of Kinetic Group because the Court granted the SEC's Motion for Asset Freeze and Other Relief and Emergency Motion for Appointment of Receiver on March 6, 2020, appointing Mark A. Kornfeld as receiver for Kinetic Group. (See Dkt. 221-2 at ¶¶ 5, 7) Third, he claims that the SEC has not established Kinetic Group "presently" charges Kinetic Funds a 1% management fee for the same reason. (See id. at ¶¶ 34, 36) However, Williams does not dispute that he was the managing member of Kinetic Group or that Kinetic Group received a 1% management fee *at the time* of the purported Advisers Act violations. Williams' arguments are without merit.

Williams also points to his Declaration, in which he attempts to raise a dispute of fact by stating he "did not engage in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities"

---

[11] The Court notes that the Operating Agreement provides that Kinetic Partners, LLC (not Kinetic Group) is the Class A Member. (Dkt. 200-6 at 6, 11) But, as noted above, Williams concedes that Kinetic Group managed Kinetic Funds and was, thus, the Class A member. (Dkt. 200-15 at 53:8-10, 60:12-16) But whether Kinetic Group or Kinetic Partners, LLC is the Class A member does not affect Williams' liability because Williams is also the managing member of Kinetic Partners, LLC. (See Dkt. 200-13)

and that he "did not receive any compensation advising [others] as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." (Dkt. 221-2 at ¶¶ 219-223) His statements, however, are contradicted by his own admissions as set forth above. See supra. A "court may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 (11th Cir. 2003). Here, Williams' affidavit is contradicted not only by his deposition testimony but also by his other admissions on file and other evidence in the record. Consequently, the Court rejects Williams' assertions.

In sum, Williams' liability under the Advisers Act has been established under Counts VII, IX, XI, and XIII. In light of the Court's finding, the Court need not address whether Williams aided and abetted Kinetic Group's Adviser Act Violations under Counts VIII, X, XII, and XIV.

## IV.   REMEDIES

The SEC seeks disgorgement, prejudgment interest, permanent injunctive relief, and a civil penalty against Williams. (Dkt. 1 at 21-23) The SEC, however, believes it appropriate to address the issue of remedies after liability has been determined. (Dkt. 200 at 36 n. 138)

### a.   Disgorge Williams' Ill-Gotten Gains

"Disgorgement is designed both to deprive a wrongdoer of unjust enrichment and deter others from violating the securities laws." Lauer, 2008 U.S. Dist. LEXIS

73026 at *93-94 (citing SEC v. First City Fin. Corp., 281 U.S. App. D.C. 410, 890 F.2d 1215, 1230 (D.C. Cir. 1989); SEC v. Manor Nursing Centers, 458 F.2d 1082, 1103-04 (2d Cir. 1972) ("the effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable"). "Where, as here, the fraud is pervasive, the Court should order the wrongdoer to disgorge all profits stemming from the scheme." Lauer, 2008 U.S. Dist. LEXIS 73026 at *94 (citing CFTC v. British Am. Commodity Options Corp., 788 F.2d 92, 93-94 (2d Cir.), cert. denied, 479 U.S. 853, 107 S. Ct. 186, 93 L. Ed. 2d 120 (1986)). "The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." Lauer, 2008 U.S. Dist. LEXIS 73026 at *94 (citing SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1475 (2d Cir. 1996), cert. denied, 522 U.S. 812, 118 S. Ct. 57, 139 L. Ed. 2d 21 (1997)).

The burden on the SEC for "showing the amount of assets subject to disgorgement (and therefore available for freeze) is light." SEC v. ETS Payphones, Inc., 408 F.3d 727, 735 (11th Cir. 2005). All that is required is "a reasonable approximation of a defendant's ill-gotten gains. . . . Exactitude is not a requirement." Id.; First City, 890 F.2d at 1231. "It is well recognized that it is often impossible to calculate disgorgement with precision and exactitude." Lauer, 2008 U.S. Dist. LEXIS 73026 at *94-95 (citation omitted). "Any risk of uncertainty about the exact amount received falls on the wrongdoer whose illegal conduct created the uncertainty." Lauer, 2008 U.S. Dist. LEXIS 73026 at *95 (citing SEC v. Inorganic Recycling Corp., 2002 U.S. Dist. LEXIS 15817, 2002 WL 1968341 (S.D.N.Y.

2002) (stating that the risk of uncertainty falls on defendants since fraudsters rarely keep accurate records of the proceeds of their crimes)). "Once the SEC makes a demonstration, the burden shifts to the defendant to demonstrate that he received less than the full amount sought to be disgorged." Lauer, 2008 U.S. Dist. LEXIS 73026 at *95 (citing SEC v. Robinson, 2002 U.S. Dist. LEXIS 12811, 2002 WL 1552049 at *5-6 (S.D.N.Y. 2002)).

Here, as in Lauer, the Court finds that the issue of damages is "heavily fact-intensive." Lauer, 2008 U.S. Dist. LEXIS 73026 at *95. In this case, the amount to be disgorged is limited to the amount, with interest, by which Williams profited from the wrongdoing. Securities and Exchange Commission v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978).[12] Because this determination is necessarily very fact-intensive, "the Court declines to determine the amount of damages on the instant motion for summary judgment." Lauer, 2008 U.S. Dist. LEXIS 73026 at *95. The Court deems it prudent to reserve on the question of the amount that should be disgorged until it has had an opportunity to conduct an evidentiary hearing on the issue. See id. at *95-96.

### b. PERMANENTLY ENJOINING WILLIAMS

"The SEC is entitled to a permanent injunction if it establishes a prima facie case of previous violations of the securities laws and a reasonable likelihood the defendant will repeat the wrongs." Lauer, 2008 U.S. Dist. LEXIS 73026 at *91 (citing

---

[12] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir.1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued on or before September 30, 1981).

S.E.C. v. Calvo, 378 F.3d 1211, 1216 (11th Cir. 2004)). "It is important to remember the SEC appears in this matter 'not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws.'" Lauer, 2008 U.S. Dist. LEXIS 73026 at *91 (quoting SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975)) Thus, the SEC need not show irreparable injury or a balance of the equities in its favor. Lauer, 2008 U.S. Dist. LEXIS 73026 at *91 (citing SEC v. Unifund SAL, 910 F.2d 1028, 1036 (2d Cir. 1990).

In light of the SEC's position that it deems it appropriate to address the issues of remedies after liability has been determined, the Court shall reserve on whether the SEC is entitled to a permanent injunction until the Parties have either briefed or presented argument on this issue at the evidentiary hearing on damages.

### C.   CIVIL PENALTIES

The SEC seeks civil penalties against Williams pursuant to Section 20(d) of the Securities Act, Section 21 (d) of the Exchange Act, and Section 209(e) of the Advisers Act. "The purpose of a civil penalty is to punish the individual violator as well as deter future violations." Lauer,  2008 U.S. Dist. LEXIS 73026 at *96 (citing SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 17 (D.D.C. 1998)). The SEC has not provided a specific penalty amount that it seeks to impose upon Williams. However, the SEC has requested that the Court retain jurisdiction over this matter in order "to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court." (Dkt. 1 at 23) To the extent the SEC seeks to impose a civil penalty upon Williams, it shall file an appropriate motion requesting such relief.

## V.    CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Defendant Michael Scott Williams' Motion for Judgment on the Pleadings, (Dkt. 201) is **DENIED AS MOOT**.

2. Plaintiff's Motion for Summary Judgment against Defendant Michael Scott Williams, (Dkt. 200) is **GRANTED**.

3. The SEC has established Williams engaged in the following misrepresentations and omissions, in violation of Section 17(a)(2) and Rule 10b-5(b) (Counts II, V):

   a. Williams negligently obtained investor money by means of an omission regarding the source of Lendacy's funding. (First Category)

   b. Williams knowingly misrepresented to investors that their investment would be invested in U.S.-listed financial products, instead diverting their capital to Lendacy, which he was the majority owner of. (Third Category)

   c. Williams knowingly misrepresented to investors that their principal would be secure because 90% of the KFYield portfolio would be hedged with U.S.-listed options. (Fourth Category)

   d. Williams knowingly misrepresented to investors that the KFYield assets had liquidity. (Fifth Category)

   e. Williams knowingly misrepresented the performance of the KFYield portfolio. (Seventh Category)

  f. Williams failed to disclose to investors that he and his entities, Scipio, and LF42, were receiving loans from Lendacy. (Ninth Category)

  g. Williams failed to disclose to investors that he used investor capital, routed to LF42 from Lendacy, to invest in Zephyr Aerospace. (Tenth Category).

4. The SEC has established Williams' scheme liability because he engaged in multiple misappropriations of investor funds in violation of § 17(a)(1), (3) and Rule 10b-5 (a), (c) (Counts I, III-IV, VI). Further Williams' knowing dissemination of misleading materials establishes scheme liability in an alternative manner because he acted with an "intent to deceive, manipulate or defraud." Ernst & Ernst, 425 U.S. at 193.

5. The SEC has established Williams violated the Advisers Act (Counts VII, IX, XI, XIII) as he engaged in material misrepresentations and/or omissions and acted as an "investment adviser" within the meaning of the Act in light of his control over Defendant Kinetic Group, which managed Kinetic Funds.

6. The amount Williams is to pay in disgorgement and prejudgment interest thereon is reserved until an evidentiary hearing can be held on the amount of damages. The Court also reserves on whether the SEC is entitled to a permanent injunction against Williams until the Parties have either briefed or presented argument on this issue at the evidentiary hearing on damages. The Court reserves jurisdiction to impose civil money penalties against Williams. The SEC

may file an appropriate motion for civil penalties **within 60 days** of the entry of summary judgment in favor of the Commission.

7. Defendant Michael Scott Williams' Motion for Summary Judgment is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida, this 22nd day of November  2024.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person